PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3459
_____

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ,

Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 2-15-cr-00155-001)
District Judge: Honorable William H. Walls
_____

Argued February 29, 2016

Before: AMBRO, JORDAN and SCIRICA, <u>Circuit Judges</u>

(Opinion filed: July 29, 2016)

Raymond M. Brown, Esquire
Greenbaum Rowe Smith & Davis LLP
P.O. Box 5600

Metro Corporate Campus One, Suite 4
Woodbridge, NJ   07095

Scott W. Coyle, Esquire
Abbe David Lowell, Esquire          (Argued)
Christopher D. Man, Esquire
Chadbourne & Parke
1200 New Hampshire Avenue, N.W.
Washington, DC   20036

Jenny R. Kramer, Esquire
Chadbourne & Parke
1301 Avenue of the Americas
New York, NY   10019

Stephen M. Ryan, Esquire
McDermott Will & Emery
500 North Capitol Street, N.W.
Washington, DC   20001

      Counsel for Appellant

Joseph P. Cooney, Esquire
  Deputy Chief
Peter M. Koski, Esquire      (Argued)
  Deputy Chief
Monique Abrishami, Esquire
Amanda R. Vaughn, Esquire
United States Department of Justice
Criminal Division, Public Integrity Section
1400 New York Avenue, N.W., 12th Floor
Washington, DC   20005

Counsel for Appellee

———————————

OPINION OF THE COURT

———————————

AMBRO, <u>Circuit Judge</u>

A 22-count indictment (the "Indictment") charges that from 2006 to 2013 United States Senator Robert Menendez of New Jersey solicited and accepted numerous gifts from his friend Dr. Salomon Melgen, a Florida-based ophthalmologist. In exchange, Senator Menendez allegedly used the power of his office to influence, among other things, an enforcement action against Dr. Melgen by the Centers for Medicare and Medicaid Services ("CMS") and to encourage the State Department and the U.S. Customs and Border Patrol ("Customs") to intervene on Dr. Melgen's behalf in a multi-million dollar contract dispute with the Dominican Republic.

Senator Menendez appeals from the denial of his motions to dismiss the Indictment. He argues that, as a United States Senator, he is protected from prosecution under the Speech or Debate Clause of our Constitution. U.S. Const. art. I, § 6, cl. 1. Though it states literally that Members of Congress "shall not be questioned in any other Place" for "any Speech or Debate in either House," its protections extend to "legislative acts" that Members perform. Senator Menendez contends that protected acts form the basis of the Indictment. He claims also that Count 22 of the Indictment—which charges him with knowingly or willfully falsifying, concealing, or covering up gifts from Dr. Melgen in violation of the Ethics in Government Act of 1978 (the "Ethics Act"), 5 U.S.C. app. 4 §§ 101-11, and 18 U.S.C. § 1001—must be

dismissed because it allows other Branches of Government to intrude on Legislative Branch matters (a separation-of-powers claim) and was brought in the wrong venue (New Jersey) instead of where it belonged (the District of Columbia). We conclude that Senator Menendez's purportedly legislative acts are not protected by the Speech or Debate Clause and that the Indictment is not otherwise deficient. Thus we affirm.

## I.  Background

### A.  Senator Menendez, Multi-Dosing, and Dr. Melgen's Dispute with CMS

At the motion-to-dismiss stage, we generally accept as true the factual allegations in an indictment. *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Our statement of facts is therefore drawn from the Indictment except where it is noted as drawn from evidence in the record.

In 2009 CMS suspected that Dr. Melgen had overbilled Medicare for $8.9 million from 2007 to 2008 by engaging in a prohibited practice known as "multi-dosing." Medicare policy required that each patient receiving the drug Lucentis be treated using a separate vial, but Dr. Melgen routinely used the extra solution from a single vial (so-called "overfill") to treat multiple patients. Because he was reimbursed as if he used a separate vial for each patient, CMS believed Dr. Melgen was paid for more vials of the drug than he actually used.

Before CMS began formal proceedings against Dr. Melgen, Senator Menendez instructed his Legislative Assistant to call the Doctor about "a Medicare problem we need to help him with." A-105 (Indict. ¶ 148). The Legislative Assistant replied that she and the Senator's Deputy Chief of Staff called Dr. Melgen twice and were "looking into how

[they could] be helpful." *Id.* (Indict. ¶ 149) (alteration in original). After CMS formally notified Dr. Melgen that it may seek reimbursement for the suspected overbilling, the Senator's Deputy Chief of Staff emailed the Legislative Assistant, "I think we have to weigh in on [Dr. Melgen's] behalf . . . to say they can't make him pay retroactively." A-107 (Indict. ¶¶ 158-59).

Senator Menendez's staff continued to work with Dr. Melgen's lobbyist on the CMS dispute and eventually arranged for the Senator to speak with Jonathan Blum, the then- Acting Principal Deputy Administrator and Director of CMS. Before that conversation, an official from the United States Department of Health and Human Services ("HHS") wrote Mr. Blum, "We have a bit of a situation with Senator Menendez, who is advocating on behalf of a physician friend of his in Florida." A-108 (Indict. ¶ 166). Meanwhile, Senator Menendez's Legislative Assistant drafted "Talking Points" for the Senator that, along with statements about policy, included statements like "I was contacted by Dr. Melgen regarding an audit by First Coast, the Medicare administrative contractor in Florida," and "I am not weighing [in] on how you should administer Lucentis, nor on how his specific audit should be resolved but rather [am] asking you to consider the confusing and unclear policy on this issue and not punish him retroactively as a result." A-108-09 (Indict. ¶ 167). Ultimately, the conversation between Senator Menendez and Mr. Blum did not resolve Dr. Melgen's dispute with CMS. The following month, after more developments in the case, the Senator noted that Dr. Melgen was "still in the non[-]litigant stage" and directed his Chief of Staff to "determine who has the best juice at CMS and [HHS]." A-109 (Indict. ¶ 173).

Almost three years later, in June 2012, Senator Menendez discussed multi-dosing with Marilyn Tavenner, the

then-Acting Administrator of CMS. There is some evidence in the record suggesting that Senator Menendez and Ms. Tavenner met to discuss her nomination to become the permanent Administrator of CMS. For example, the Senator's calendar noted that they were meeting about Ms. Tavenner's "nomination before the [Senate] Finance Committee." A-462. However, there is no evidence suggesting that her nomination was actually discussed when they met. *See* A-1313 (Tavenner FD-302); A-1254-55 (Martino FD-302).

To prepare for the meeting, the Senator met with Dr. Melgen's lobbyist. A handwritten note for Senator Menendez mentioned Dr. Melgen and his lobbyist by name and reminded the Senator to "[m]ake the larger policy case" to Ms. Tavenner. A-1316. On the other side, Mr. Blum alerted Ms. Tavenner to Senator Menendez's interest in Dr. Melgen's case.

Once together, Senator Menendez pressed Ms. Tavenner about multi-dosing and advocated on behalf of the position favorable to Dr. Melgen in his Medicare billing dispute with CMS. Contemporaneous notes reported that Senator Menendez and Ms. Tavenner discussed CMS's multi-dosing policy but made no mention of Dr. Melgen or his case.

A follow-up call between Senator Menendez and Ms. Tavenner took place a few weeks later. Before the call, Dr. Melgen's lobbyist prepared a memorandum entitled "Talking Points: CMS Policy" and shared it with the Senator's staff, who incorporated it into a separate memorandum prepared for Senator Menendez. A-114 (Indict. ¶ 201). The latter memorandum noted that "[t]he subject of the call [wa]s to discuss the issue [of] Medicare reimbursement when a physician multi-doses from a single dose vial," but it also made several references to Dr. Melgen's case, such as "[w]e're talking about payments made in 2007-2008" and

"[i]t's clear that CMS is taking steps to clarify both multi-dosing from single-dose vials and overfills going forward. This is, in effect, admitting that these policies didn't exist before and don't apply during the 2007-2008 period. Therefore they don't have any bearing on the issue at hand." A-115 (Indict. ¶ 202). To the Government, the "issue at hand" was Dr. Melgen.

During the call, Ms. Tavenner said CMS would not alter its position on multi-dosing and Senator Menendez threatened to raise the issue of multi-dosing directly with Kathleen Sebelius, the then-Secretary of HHS who oversaw CMS. After the call, Dr. Melgen's lobbyist spoke with one of the Senator's staffers, and the staffer reported to the Senator that the lobbyist was "encouraged, but mainly because he's increasingly confident they won't have a leg to stand on should [Dr. Melgen] litigate. But we're all hopeful it won't come to that." A-116 (Indict. ¶ 207). The Indictment does not allege specifically that Senator Menendez mentioned Dr. Melgen by name to Ms. Tavenner.

A week later, the scheduler for the then-Majority Leader of the Senate, Harry Reid, arranged a meeting among Senator Reid, Senator Menendez, and Secretary Sebelius. Senator Menendez told his staff that he did not want to tell Dr. Melgen about the arrangement "so that I don't raise expectation[s] just in case it falls apart," A-117 (Indict. ¶ 210), though the Senator met with Dr. Melgen's lobbyist before the meeting and received a summary of the latest developments in Dr. Melgen's dispute with CMS. At the meeting with Secretary Sebelius and Senator Reid, Senator Menendez advocated on behalf of Dr. Melgen's position in the Medicare billing dispute, focusing on his specific case and asserting unfair treatment of it. Mr. Blum, who accompanied the Secretary to the meeting on behalf of CMS, later told the FBI he did not recall anyone mentioning Dr. Melgen by

name, but said it was clear to him that the Senators were talking about Dr. Melgen and that the issue with his billing "was an isolated issue as opposed to a general problem." A-1136 (Blum FD-302). Senator Reid told the FBI that Dr. Melgen's name probably came up during the meeting because his "individual situation was clearly the purpose of the meeting and they would have otherwise been speaking in a vacuum." A-1301 (Reid FD-302). Secretary Sebelius told Senator Menendez that because Dr. Melgen's case was in the administrative appeals process, she had no power to influence the matter.

### B. Senator Menendez, Port Security, and Dr. Melgen's Dispute with the Dominican Republic

In February 2012, Dr. Melgen obtained exclusive ownership of a contract held by a company in the Dominican Republic named ICSSI. The contract gave ICSSI exclusive rights to install and operate X-ray imaging equipment in Dominican ports for up to 20 years and required all shipping containers to be X-rayed at a tariff of up to $90 per container. ICSSI and the Dominican Republic disputed the validity of the contract and had already begun litigating the issue.

The following month, a former Menendez staffer who worked for Dr. Melgen requested a phone call with Assistant Secretary of State William Brownfield to discuss ICSSI's contract. A State Department official reported to the Assistant Secretary that the former staffer "dropped the name of Sen. Menendez pretty squarely as having an interest in [the] case." A-98 (Indict. ¶ 119). That former staffer later met with the Assistant Secretary and represented that he (the staffer) spoke on behalf of "a United States entity involved in a contract dispute with the Government of the Dominican Republic concerning the screening of shipping containers at Dominican

ports." *Id.* (Indict. ¶ 120). He referenced New Jersey connections to the dispute.

Senator Menendez's Senior Policy Advisor arranged a meeting in May 2012 between the Senator and Assistant Secretary Brownfield about U.S. policy relating to Dominican port security. At the meeting, Senator Menendez advocated for Dr. Melgen's interest in his foreign contract dispute, questioning the Assistant Secretary about the dispute and expressing dissatisfaction with the State Department's lack of initiative in the case. Assistant Secretary Brownfield later summarized the meeting in an email to his staff, noting that Senator Menendez "allud[ed] to" a particular company and that the Senator threatened to call a hearing if there was no solution. A-101 (Indict. ¶ 125).

In June 2012, Senator Menendez's Senior Policy Advisor emailed Assistant Secretary Brownfield's staff for an update on the Dominican port issue. A few days later, the Assistant Secretary told his staff that Dr. Melgen's case "is the case about which Sen. Menendez threatened to call me to testify at an open hearing. I suspect that was a bluff, but he is very much interested in its resolution. A reminder that I owe the Senator an answer to the question 'What can we do to resolve this matter?'" *Id.* (Indict. ¶ 129). Assistant Secretary Brownfield later forwarded to his staff another email from Dr. Melgen's representative and wrote, "More on [Senator] Menendez'[s] favorite DR port contract case." A-102 (Indict. ¶ 131).

Senator Menendez subsequently directed his Chief Counsel to ask Customs about its rumored donation to the Dominican Republic of equipment for the monitoring and surveillance of shipping containers. The equipment would have made it easier for the Dominican Republic to increase port security without honoring its disputed contract with

9

ICSSI. The Senator's Chief Counsel emailed a Customs employee the following:

> My boss asked me to call you about this. Dominican officials called him stating that there is a private company that has a contract with [the Department of Homeland Security] to provide container shipment scanning/monitoring in the [Dominican Republic]. Apparently, there is some effort by individuals who do not want to increase security in the [Dominican Republic] to hold up that contract's fulfillment. These elements (possibly criminal) want [Customs] to give the government equipment because they believe the government use of the equipment will be less effective than the outside contractor. My boss is concerned that the [Customs] equipment will be used for this ulterior purpose and asked that you please consider holding off on the delivery of any such equipment until you can discuss this matter with us[—]he'd like a briefing.

*Id.* (Indict. ¶ 133). The employee responded that Customs was not providing the Dominican Republic with any such equipment and confirmed with Senator Menendez's Chief Counsel that the "private company" referred to was ICSSI. A-103 (Indict. ¶¶ 139-42).

### C.  Senator Menendez's Financial Disclosures

Under the Ethics Act, Senators are required to file with the Secretary of the United States Senate in Washington, D.C., an annual financial disclosure form reporting, among other things, income, gifts, and financial interests from the prior calendar year. While Senator Menendez was subject to that obligation, Dr. Melgen and his companies allegedly gave the Senator reportable gifts, including "private, chartered, and first-class commercial flights," a car service, and hotel stays in Paris, France, and Punta Cana, Dominican Republic. A-135 (Indict. ¶ 272). Senator Menendez did not disclose any reportable gifts from Dr. Melgen in his filings during the relevant years. The Indictment claims that the Senator engaged in conduct "in the district of New Jersey and elsewhere" to falsify, conceal, and cover up those allegedly reportable gifts. *Id.* (Indict. ¶ 271).

### D.  Procedural History

In late 2014, two Menendez staffers (one current and one former) invoked the privilege conferred by the Speech or Debate Clause to withhold testimony before a federal grand jury investigating the Senator's dealings with Dr. Melgen. The parties disputed how protective the privilege was, and the District Court ultimately granted the Government's motion to compel the staffers' testimony. On appeal, we ruled that the privilege did not necessarily protect Senator Menendez's "informal communications with Executive Branch officials, one of whom [(Ms. Tavenner)] was at the time a presidential nominee whose nomination was pending before the United States Senate." *In re Grand Jury Investig. (Menendez)*, 608 F. App'x 99, 101 (3d Cir. 2015). However, we required additional fact-finding to determine if the privilege applied. Thus we remanded the matter to the District Court for "specific    factual    findings    about    the    communications

implicated by the grand jury questions" and with instructions to "separately analyze[]" the "contents and purposes of each disputed communication." *Id.* On remand, the Government presented the disputed evidence through a summary witness and the District Court did not rule on the privilege issue again.

The grand jury decided to charge Senator Menendez and Dr. Melgen, and the Indictment issued in April 2015. The Senator moved to dismiss on several grounds, including the Speech or Debate privilege and, with respect to Count 22 alleging reporting violations under the Ethics Act, the separation of powers among the Branches of Government and faulty venue. The District Court denied the motions. It held that Senator Menendez failed to prove that the Indictment references any legislative acts covered by the Speech or Debate Clause. It also ruled that the Ethics Act charge was consistent with separation-of-powers constraints and that venue was proper in New Jersey.

Senator Menendez then took this appeal. The Government moved to dismiss parts of it for lack of jurisdiction, arguing that the District Court's denial of the motion to dismiss for lack of venue was not immediately appealable. *See, e.g.*, *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 378 (3d Cir. 2002). We agreed, but because the "appropriate mechanism" for reviewing an allegedly improper ruling regarding venue in the absence of an appealable final order is mandamus, *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*, 5 F.3d 28, 30 (3d Cir. 1993), we denied the Government's motion and restricted Senator Menendez to raising the venue issue only in the form of a "request for a petition for a writ of mandamus concerning venue," Order, Dec. 11, 2015.

The District Court exercised jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over the Speech or Debate Clause issues under the collateral order doctrine. *United States v. McDade*, 28 F.3d 283, 288 (3d Cir. 1994). Under the specific circumstances here, we have pendent appellate jurisdiction over Senator Menendez's separation-of-powers claims. *See CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 136 (3d Cir. 2004). And we have jurisdiction over Senator Menendez's request for a petition for a writ of mandamus under 28 U.S.C. § 1651(a).

## II.  Standard of Review

"[O]ur standard of review is mixed" for motions to dismiss. *Huet*, 665 F.3d at 594. We review the District Court's legal conclusions *de novo* and its factual determinations, including its findings about the contents and purposes of the acts alleged in the Indictment, for clear error. *Id.* Senator Menendez argues that we should review the District Court's findings *de novo* as findings of constitutional fact, *i.e.*, "a fact whose 'determination is decisive of constitutional rights.'" *Zold v. Twp. of Mantua*, 935 F.2d 633, 636 (3d Cir. 1991) (quoting *N.J. Citizen Action v. Edison Twp.*, 797 F.2d 1250, 1259 (3d Cir. 1986)). But factual findings are not subject to plenary review simply because they are material to constitutional analyses. Outside the unique First Amendment context that requires "independent appellate review" of certain factual findings, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510 (1984), we review findings of historical fact for clear error even when they affect constitutional rights, *see Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding that findings of narrative or historical fact related to Fourth Amendment rights are reviewed for clear error); *see also United States v. Renzi*, 651 F.3d 1012, 1020-21 (9th Cir. 2011) (reviewing for clear error a district court's findings of fact in the context of a motion to

dismiss an indictment on Speech or Debate Clause grounds). Here the District Court found historical facts, so we will review those findings for clear error notwithstanding their relevance to the constitutional analysis.

Under the clear error standard, reversal of the District Court's factual findings is warranted only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Lowe*, 791 F.3d 424, 427 (3d Cir. 2015). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, we will not reverse it even if, as the trier of fact, we would have weighed the evidence differently." *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (internal quotation marks omitted). Although our review at this stage of a prosecution is ordinarily limited to the allegations in the Indictment, *see United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000), we can consider extrinsic evidence to determine whether the Speech or Debate Clause applies, *see Gov't of the Virgin Islands v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985).

The mandamus petition pertaining to Count 22 is "subject to a stringent standard of review." *Delalla v. Hanover Ins.*, 660 F.3d 180, 183 n.2 (3d Cir. 2011). "[I]n order to grant mandamus relief, 'an appellate court must find a clear legal error calling for relief that can be obtained through no other means.'" *Id.* (emphasis omitted) (quoting *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1074 (3d Cir. 1983)). In other words, that relief is "appropriate only upon a showing of (1) a clear abuse of discretion or clear error of law; (2) a lack of an alternate avenue for adequate relief; and (3) a likelihood of irreparable injury." *United States v. Wright*, 776 F.3d 134, 146 (3d Cir. 2015).

14

### III.  Discussion

A.  The Speech or Debate Clause

To repeat, the Speech or Debate Clause provides that "for any Speech or Debate in either House" Members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *In re Grand Jury*, 821 F.2d 946, 952 (3d Cir. 1987) (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975)). It was "not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507 (1972); *see also Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (stating that legislators must be "immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good").

The Supreme Court has read the Clause "broadly" to guarantee Members of Congress immunity from criminal or civil liability based on their legislative acts, *Gravel v. United States*, 408 U.S. 606, 615 (1972), and to create a privilege against the use of "evidence of a legislative act" in a prosecution or before a grand jury, *United States v. Helstoski*, 442 U.S. 477, 487 (1979); *see Gravel*, 408 U.S. at 622. But because the privilege "was designed to preserve legislative independence, not supremacy," invocations of it that go "beyond what is needed to protect legislative independence" must be "closely scrutinized." *Hutchinson v. Proxmire*, 443 U.S. 111, 126-27 (1979). More specifically, "the Speech or Debate Clause must be read broadly to effect[] its purpose of protecting the independence of the Legislative Branch, but no

15

more than the statutes we apply . . . was its purpose to make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. A Member seeking to invoke the Clause's protections bears "the burden of establishing the applicability of legislative immunity . . . by a preponderance of the evidence." *Lee*, 775 F.2d at 524 (citing *In re Grand Jury Investig. (Eilberg)*, 587 F.2d 589, 597 (3d Cir. 1978)).

In practice, the Speech or Debate privilege affords protection from indictment only for "legislative activity." *Gravel*, 408 U.S. at 625; *see also United States v. Johnson*, 383 U.S. 169, 184-85 (1966); *United States v. Helstoski*, 635 F.2d 200, 205-06 (3d Cir. 1980). Legislative acts have "consistently been defined as [those] generally done in Congress in relation to the business before it." *Brewster*, 408 U.S. at 512. They do not include "all things in any way related to the legislative process." *Id.* at 516; *see Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature."). The takeaway is that "[t]he Speech or Debate Clause does not immunize every official act performed by a member of Congress." *McDade*, 28 F.3d at 295. Rather, it protects only acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

This plays out in a two-step framework for identifying legislative acts protected by the Speech or Debate Clause. First, we look to the form of the act to determine whether it is inherently legislative or non-legislative. Some acts are "so clearly legislative in nature that no further examination has to

be made to determine their appropriate status." *Lee*, 775 F.2d at 522. Examples of "manifestly legislative acts" include introducing and voting on proposed resolutions and legislation, introducing evidence and interrogating witnesses during committee hearings, subpoenaing records for committee hearings, inserting material into the Congressional Record, and delivering a speech in Congress. *See id.* (listing cases). And even though "such manifestly legislative acts may have been pursued and accomplished for illegitimate purposes, such as personal gain, the acts themselves [are] obviously legislative in nature." *Id.* Thus "an unworthy purpose" does not eliminate Speech or Debate protection. *Johnson*, 383 U.S. at 180 (quoting *Tenney*, 341 U.S. at 377); *see also Eastland*, 421 U.S. at 508 ("Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."); *Youngblood v. DeWeese*, 352 F.3d 836, 840-41 (3d Cir. 2003) (concluding without any "consideration[] of intent and motive" that a legislator's appropriation of state funds was legislative activity).

On the other side of the spectrum, some acts are so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them. Examples include legitimate constituent services such as "the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress," *Brewster*, 408 U.S. at 512, and, of course, illegitimate activities such as accepting bribes in exchange for taking official action, *id.* at 526. Even if these non-legislative acts involve policy or relate to protected legislative activity, they are not protected. *See Hutchinson*, 443 U.S. at 130-33 (holding that newsletters and press releases are outside the scope of the Speech or Debate Clause even if they address matters of legislative

17

importance); *see also Brewster*, 408 U.S. at 515 ("In no case has this Court ever treated the Clause as protecting all conduct relating to the legislative process.").

If an act is neither manifestly legislative nor clearly non-legislative, then it is ambiguously legislative, and we proceed to the second step of the Speech or Debate analysis. There we consider the content, purpose, and motive of the act to assess its legislative or non-legislative character. *See Lee*, 775 F.2d at 522-24. Ambiguously legislative acts—including trips by legislators and informal[1] contacts with the Executive Branch—will be protected or unprotected based on their particular circumstances. *See id.* at 524. In *Lee*, for example, a legislator from the Virgin Islands faced criminal charges for a trip he took supposedly on the Government's behalf. He argued that legislative immunity barred the prosecution because he engaged in legislative fact-finding during the trip. We first explained that there was nothing inherently legislative or non-legislative about the trip because it was only legislative to the extent it "involved legislative fact-finding." *Id.* at 522. Rather, "[i]t is the content of Lee's private conversations, and not the mere fact that the conversations took place, that determines whether Lee is entitled to legislative immunity." *Id.* We then determined that Lee's conversations were not "in fact . . . legislative in nature so as to trigger the immunity." *Id.* To reach that conclusion, we considered "the content of Lee's private conversations" and his "purpose or motive" for engaging in them. *Id.* at 522-24.

---

[1] We use the word "informal" to exclude manifestly legislative acts, such as communications with Executive Branch officials during committee hearings or the passage of legislation, that are protected even if they influence or coerce the Executive Branch.

Senator Menendez proposes two alternative standards for distinguishing between legislative and non-legislative acts at step two. He first argues that an ambiguously legislative act should be "viewed objectively and, if it appears legislative, that should end the inquiry with the privilege upheld." Menendez Br. at 33. But *Lee* expressly rejected the view that Speech or Debate immunity "protects not only legislative acts, but also acts which are *purportedly* or *apparently* legislative in nature." 775 F.2d at 522 (emphasis in original). Rather, we consider a legislator's purpose and motive to the extent they bear on whether "certain legislative acts were in fact taken" or whether "non-legislative acts [are being] misrepresented as legislative" in order to invoke the Speech or Debate privilege improperly. *Id.* at 524. Only after we conclude that an act is in fact legislative must we refrain from inquiring into a legislator's purpose or motive. *Id. Lee*'s holding is not limited to after-the-fact characterizations of acts as legislative, as Senator Menendez contends, nor does it suggest that the privilege prevents us from considering evidence of a purportedly legislative act's true character.

The authority Senator Menendez cites to the contrary misses the mark. He cites a statement in *United States v. McDade* for the principle that it is inappropriate to consider a legislator's motives when determining the character of an ambiguously legislative act. *McDade* considered whether the Speech or Debate Clause protected a Congressman's two ambiguously legislative letters, one that "openly lobbie[d]" the Executive Branch on behalf of a particular business in his district and one that discussed a "broader policy question" without "explicitly refer[ring] to any particular business." 28 F.3d at 300. Though the *McDade* Court suggested that the second letter "appear[ed] on its face" to be ambiguously legislative, it resolved the case without deciding whether the letters were legislative activity within the scope of the Clause.

*Id.* The statement is thus a *dictum*, neither binding on us nor even a conclusive determination of the relevant legal issue.

Senator Menendez next cites three distinguishable cases from other circuits. Two involve manifestly legislative activity rather than ambiguously legislative activity that might appear legislative on its face. *See United States v. Dowdy*, 479 F.2d 213, 224-26 (4th Cir. 1973) (holding that actions pursuant to an investigation authorized by the Chairman of the House Subcommittee on Investigations were legislative notwithstanding evidence that the investigation was performed in exchange for a bribe); *McSurely v. McClellan*, 553 F.2d 1277, 1296 (D.C. Cir. 1976) (en banc) (per curiam) (holding that a Congressman's actions pursuant to an officially sanctioned Congressional investigation would be legislative notwithstanding evidence of impure motive, but noting that his inquiry into private matters beyond the scope of the investigation were not); *see also Lee*, 775 F.2d at 524 (treating *Dowdy* as limited to cases involving "admittedly" legislative activity). And the third case is consistent with *Lee* because it allows the Government to inquire into the reasons for apparently legislative activity. *See United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) (ruling that the Government may properly present arguments about the "non[-]legislative reasons" for the defendant's purportedly legislative act); *see also id.* at 104 ("The fact that one of the purposes of the travel may have been the conduct of legislative activity does not preclude a conviction."). We therefore reject Senator Menendez's first argument that the Speech or Debate Clause necessarily protects apparently legislative activity. Courts may dig down to discern if it should be deemed legislative or non-legislative.

Senator Menendez's second alternative posits that the Speech or Debate privilege protects any effort by a Member to oversee the Executive Branch, including informal efforts to

influence it. *See* Menendez Br. at 14-18, 19 & n.5; *see also Hutchinson*, 443 U.S. at 136 (Stewart, J., concurring in part and dissenting in part). That blanket approach is much too broad, as it would immunize many illegal acts that have only dubious ties to the legislative process. Like all acts by Members, oversight activities exist along a spectrum: the Speech or Debate protection is obvious at the edges where they are manifestly legislative or clearly non-legislative, but it is not obvious in the middle ground where they are ambiguously legislative and consideration of their content, purpose, and motive is necessary. *See McDade*, 28 F.3d at 299-300. Senator Menendez's informal communications with Executive Branch officials are ambiguously legislative, so this case is fought on that middle ground, and claims of "oversight" do not automatically result in Speech or Debate protection.

The Government takes a much harder line: it argues that the Speech or Debate "protection does not extend to Legislative attempts to influence Executive actions, as those actions are the domain of the Executive." Gov't Br. at 24. Though it concedes that the Clause protects formal efforts to encourage or command the Executive Branch to do something (*e.g.*, by "voting for a resolution," "preparing investigative reports," "addressing a congressional committee," or "speaking before the legislative body in session"), *id.* at 23 (quoting *Youngblood*, 352 F.3d at 840), it nonetheless contends that any other attempts to influence the Executive Branch are categorically outside the scope of the immunity, *see id.* at 25 ("[T]he Speech or Debate Clause does not apply to efforts by members of Congress to influence the Executive Branch." (quoting *McDade* 28 F.3d at 299)).

We disagree with the Government's all-encompassing position. Consistent with our two-step approach to Speech or Debate privilege determinations, informal efforts to influence

the Executive Branch are ambiguously legislative in nature and therefore may (or may not) be protected legislative acts depending on their content, purpose, and motive. In general, efforts by legislators to "cajole" and "exhort" Executive Branch officials "with respect to the administration of a federal statute" are not protected. *Gravel*, 408 U.S. at 625. They include efforts to intervene in decisions pending before the Executive Branch that would mainly affect one particular party. *See McDade*, 28 F.3d at 300; *see also* Menendez Br. at 20 (distinguishing protected oversight from unprotected oversight based on "whether the Member was simply assisting a particular person or was addressing a broader policy question" (internal quotation marks omitted)). But informal attempts to influence the Executive Branch on policy, for actual legislative purposes, may qualify as "true legislative oversight" and merit Speech or Debate immunity. *McDade*, 28 F.3d at 304 (Scirica, J., concurring); *see In re Grand Jury Investig. (Menendez)*, 608 F. App'x at 100 (noting that "informal oversight" is not necessarily protected, but may be in some cases even though it is "not manifestly legislative"). Like all inquiries into ambiguously legislative acts, that distinction will turn on the content, purpose, and motive of the communications at issue. The consequence of accepting the Government's position would be to place legitimate policy-based efforts under the specter of possible indictment.

Senator Menendez does not prevail, however, because the acts alleged in this case were essentially lobbying on behalf of a particular party and thus, under the specific circumstances here, are outside the constitutional safe harbor. He claims that the Indictment improperly references five supposedly legislative acts: (1) his meeting with Ms. Tavenner; (2) his follow-up call with her; (3) his meeting with Secretary Sebelius; (4) his meeting with Assistant Secretary Brownfield; and (5) his staff's communications

with Customs employees. Senator Menendez's opening brief
suggests that the District Court erred in its treatment of
several other acts alleged in the Indictment, but he specifies in
his reply brief that he is challenging only these five acts on
appeal.[2]   The District Court found that these acts were
informal attempts to influence the Executive Branch
specifically on Dr. Melgen's behalf and not on broader issues
of policy. *See, e.g.*, A-20 ("[Senator] Menendez fails to meet
his burden to demonstrate that the primary goal of these
communications was not to lobby the Executive Branch to
enforce Dr. Melgen's specific contract, a non-legislative
activity."); A-21 ("The Court finds that Senator Menendez
does not meet his burden to establish that the predominant
purpose of these emails was to gather information for a
legislative purpose rather than to lobby for a postponement of

_____

[2] For example, he argued that a meeting he attended
between Dr. Melgen and Senator Tom Harkin, the then-Chair
of the Senate Health, Education, Labor, and Pensions
Committee, was protected legislative fact-finding. But even
there, evidence suggests that Senator Menendez was not
engaged in legislative fact-finding, but rather that he and Dr.
Melgen sought Senator Harkin's assistance with Dr. Melgen's
particular CMS dispute. *See, e.g.*, A-1152-53 (Harkin FD-
302) ("[Senator] Harkin believes [Senator] Menendez asked
him to meet with [Dr.] Melgen because [Dr.] Melgen had a
problem that needed to be addressed."); A-112 (Indict. ¶ 186)
(alleging that an email from a Menendez staffer to Senator
Harkin's Chief of Staff mentioned Dr. Melgen's CMS
dispute). Hence the District Court's finding that the meeting
was an attempt to assist Dr. Melgen specifically was not
clearly erroneous, and the meeting was unprotected by the
Speech or Debate privilege.

planned official action."). Unless those findings were clearly erroneous, they require us to hold that the challenged acts are not legislative and that the Speech or Debate privilege does not apply to them. And for the reasons that follow, clear error is not evident.

Senator Menendez argues that the five challenged acts were legislative because they addressed questions of policy. He relies primarily on allegations from the Indictment and evidence in the record showing that each of the challenged acts involved policy discussions. *See, e.g.*, A-114 (Indict. ¶ 200) ("[Senator] Menendez pressed [Ms. Tavenner] *about multi-dosing and Medicare payments*, and advocated on behalf of *the position* favorable to [Dr.] Melgen." (emphases added)); A-116 (Indict. ¶ 204) (alleging that the follow-up call with Ms. Tavenner addressed CMS's "position regarding billing" and its decision to "follow[] the CDC guidelines"); A-99-100 (Indict. ¶ 123) (alleging that Senator Menendez requested a meeting with Assistant Secretary Brownfield "to talk about DR (cargo from [Dominican Republic] coming into US ports)"); A-1314 (Tavenner FD-302) (reporting that Ms. Tavenner's follow-up call with Senator Menendez addressed "the policy regarding billing for vials"); A-1135 (Blum FD-302) (reporting that the "focus of the conversation" at the Sebelius meeting was "the policy," and that Senator Menendez and Senator Reid told Secretary Sebelius they "were not there to talk about a particular case; they were there to talk about policy"); A-1306 (Sebelius FD-302) (reporting that Senator Menendez and Senator Reid spoke "broadly about . . . healthcare providers"). He also points to allegations and evidence suggesting that Dr. Melgen was not mentioned by name in the supposedly protected communications. *See, e.g.*, A-101 (Indict. ¶ 125) (alleging that the "issue of a US company" doing business in the Dominican Republic was only "allud[ed] to" at the Brownfield meeting); Menendez Br. at 41 ("No participant stated that [Dr.] Melgen or his case was

mentioned.”); *id.* at 45 (“[N]obody could recall Dr. Melgen’s name being mentioned.”); Menendez Reply Br. at 24 (“[T]he Indictment does *not* allege th[e] email [to Customs] identified [Dr.] Melgen or his company.” (emphasis in original)). In light of these observations, Senator Menendez asserts that the District Court clearly erred when it found that the challenged acts were informal attempts to influence the Executive Branch specifically on Dr. Melgen’s behalf and not on broader issues of policy.

But the existence of evidence to support an alternative finding—that Senator Menendez was concerned with broader issues of policy—does not mean that the District Court’s findings are clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). For there is much to confirm that the District Court’s “account of the evidence is plausible in light of the record viewed in its entirety.” *Id.* First, evidence exists that Dr. Melgen or his case was mentioned specifically during each of the challenged acts. *See, e.g.*, A-1307 (Sebelius FD-302) (reporting that Secretary Sebelius told Senator Menendez “*the case at issue* [(*i.e.*, Dr. Melgen’s case)] was no longer within [her] jurisdiction because it was in the appeals process” (emphasis added)); A-1301 (Reid FD-302) (reporting that Dr. Melgen’s name probably came up during the Sebelius meeting “because [Dr.] Melgen’s individual situation was clearly the purpose of the meeting and they would have otherwise been speaking in a vacuum”); A-1302 (Reid FD-302) (“[Senator] Reid considered his role in setting up the meeting with [Secretary] Sebelius to be offering assistance to [Senator] Menendez in order that [Senator] Menendez might be able to offer assistance to [Dr.] Melgen.”); A-100-02 (Indict. ¶¶ 124-131) (alleging that Senator Menendez “questioned [Assistant Secretary Brownfield] about the contract dispute between [Dr. Melgen] and the Dominican Republic”). The unrebutted allegations of the Indictment and evidence in the record further suggest that

participants in the challenged acts were aware that their policy discussions related specifically to Dr. Melgen. *See, e.g.*, A-1313 (Tavenner FD-302) (reporting that Mr. Blum told Ms. Tavenner before her meeting with Senator Menendez that the Senator was interested in Dr. Melgen's case); A-118 (Indict. ¶ 216) (alleging that Senator Menendez "focus[ed] on [Dr.] Melgen's specific case" during the Sebelius meeting and "assert[ed] that [Dr.] Melgen was being treated unfairly"); A-1307 (Sebelius FD-302) (reporting that Secretary Sebelius told Senator Menendez at their meeting that she had no power to influence Dr. Melgen's case); A-98 (Indict. ¶ 119) (alleging that Assistant Secretary Brownfield was told before his meeting with Senator Menendez that the latter "pretty squarely" had an "interest" in Dr. Melgen's case); A-100-02 (Indict. ¶¶ 124-131) (alleging that, after the Brownfield meeting, Assistant Secretary Brownfield referred to Dr. Melgen's case as the one "about which Sen. Menendez threatened to call me to testify" and "[Senator] Menendez'[s] favorite DR port contract case").

In sum, evidence is plentiful that to most of those involved the focal point of the meetings with Executive Branch officials was Dr. Melgen. That Senator Menendez framed those meetings using the language of policy does not entitle them unvaryingly to Speech or Debate protection. Rather, for every mention of policy concerns there is substantial record support for the District Court's findings that those concerns were instead attempts to help Dr. Melgen. The evidence in favor of Senator Menendez will no doubt channel forcefully his position at trial, where the burden will be on the Government to convince jurors to find in its favor beyond a reasonable doubt. But at this stage the burden is on Senator Menendez. It was not clear error for the District Court to find that the Senator acted primarily for Dr. Melgen.

Second, there is evidence about the preparations for the challenged acts suggesting that Dr. Melgen was the primary focus of the supposedly protected communications. Unrebutted allegations in the Indictment and materials in the record suggest that Senator Menendez prepared for the CMS-related acts with an eye toward Dr. Melgen's specific situation. *See, e.g.*, A-114 (Indict. ¶ 199) (alleging that Senator Menendez prepared for the Tavenner meeting by speaking with Dr. Melgen's lobbyist); A-115 (Indict. ¶ 202) (alleging that a memo prepared for Senator Menendez in advance of the Tavenner call described the "issue at hand" as "payments made in 2007-2008," the same years as Dr. Melgen's purported overbilling); SA-5-8 (email from Dr. Melgen's lobbyist to a Menendez staffer explaining the scope of Dr. Melgen's dispute with CMS in advance of Senator Menendez's follow-up call with Ms. Tavenner); A-117 (Indict. ¶ 210) (alleging that Senator Menendez did not tell Dr. Melgen about the Sebelius meeting so as not to "raise [his] expectation[s] just in case it falls apart"). We do not accept Senator Menendez's suggestion that the Speech or Debate Clause somehow prevents consideration of relevant circumstantial evidence simply because it predated the purportedly legislative act. *See Lee*, 775 F.2d at 524-25.

Third, there are unrebutted allegations and materials in the record suggesting that Dr. Melgen and his lobbyist were particularly interested in following up with Senator Menendez on all of the challenged acts. *See, e.g.*, A-116 (Indict. ¶ 205) (alleging that Dr. Melgen's lobbyist wrote to a Menendez staffer after the Tavenner meeting that he (the lobbyist) was "eager to learn how the call went today"); *id.* (Indict. ¶ 207) (alleging that Dr. Melgen's lobbyist told a Menendez staffer that he (the lobbyist) was "hopeful it won't come to" litigation after the Tavenner meeting); A-116-17 (Indict. ¶ 208) (alleging that Dr. Melgen's lobbyist asked to be told when Ms. Tavenner responded to Senator Menendez because

"at some point I have to make a decision whether to recommend to [Dr. Melgen] to go to court rather than wait any longer. I did not want to take any action until I knew that other avenues were shut down"); A-118-19 (Indict. ¶ 217) (alleging that Dr. Melgen's lobbyist asked for "further briefing" on the Sebelius meeting). While this could be seen as evidence of Dr. Melgen's interest in the outcome of a genuine policy discussion, it could also be viewed as his interest in the outcome of casework performed on his behalf. Because the record supports both views, the District Court's findings were not clearly erroneous.

Fourth, Senator Menendez ignores unfavorable aspects of the evidence on which he relies. For example, he cites a note that urged him to "[m]ake the larger policy case" at his meeting with Ms. Tavenner, but that note also mentioned Dr. Melgen and his lobbyist by name. *See* A-1316. Far from showing that that Dr. Melgen was clearly not discussed at the meeting, the note suggests that any discussion of policy involved Dr. Melgen's particular case. Similarly, Senator Menendez points out that the Indictment alleges only that the "DR port issue" was discussed at the Brownfield meeting and that the "issue of a US company" doing business in the Dominican Republic was only "allud[ed] to." A-101 (Indict. ¶ 125). But the source of that quoted language also indicated that Assistant Secretary Brownfield promised he would try to "leverage a correct . . . decision on the port contract." A-101 (Indict. ¶ 125). By not referencing a promise relating specifically to "the port contract," especially when the Indictment alleges that Senator Menendez pressed Assistant Secretary Brownfield specifically on his inaction with respect to Dr. Melgen's contract dispute, the Senator asks us to ignore relevant and material evidence. We do not view the record through such a narrow lens.

Record evidence and unrebutted allegations in the Indictment cause us to conclude that the District Court did not clearly err when it found that the challenged acts were informal attempts to influence the Executive Branch toward a political resolution of Dr. Melgen's disputes and not primarily concerned with broader issues of policy. Because there is substantial support for the District Court's findings, we lack "the definite and firm conviction that a mistake has been committed." *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011). Those findings support the Court's conclusion that the Senator's acts were not legislative. Thus the Speech or Debate privilege does not apply.

Senator Menendez also advances two alternative grounds for claiming that some of the challenged acts are protected by Speech or Debate immunity. First, he argues that he used the meeting and follow-up call with Ms. Tavenner to vet her as the President's nominee to become the permanent CMS Administrator. He points to some evidence suggesting that his interactions with Ms. Tavenner were related to her pending nomination, not her role as acting CMS Administrator. *See* A-462 (entry in Senator Menendez's calendar reflecting that the meeting with Ms. Tavenner was "re: her nomination before the Finance Committee"); A-323 (grand jury testimony of a Menendez staffer claiming that the purpose of the Tavenner meeting was "consideration of her nomination"); Menendez Reply Br. at 20 n.11 (arguing that the follow-up call, as a continuation of the meeting, was also part of the vetting process).

But the way that Senator Menendez chooses to characterize his actions does not resolve the Speech-or-Debate-Clause question. *See Lee*, 775 F.2d at 522. For there is evidence in the record suggesting that the meeting and follow-up call with Ms. Tavenner were not related to her nomination. *See, e.g.*, A-1312-13 (Tavenner FD-302)

(reporting that Ms. Tavenner twice requested a meeting with Senator Menendez about her confirmation but received no response, and she "did not expect her nomination to go forward" when she met with Senator Menendez); SA-14 (email from one Senator Reid staffer to another stating, in the same month as the meeting with Ms. Tavenner, that her nomination was "dead"); SA-2-4 (interoffice memorandum summarizing the Tavenner meeting so Senator Menendez could prepare for the follow-up call but never mentioning Ms. Tavenner's nomination); A-116-17 (Indict. ¶¶ 204, 209) (alleging that Senator Menendez threatened to take his complaints to Secretary Sebelius, implicitly suggesting that the complaints were unrelated to Ms. Tavenner's nomination). And, perhaps most telling, Ms. Tavenner told the FBI that her "nomination was not mentioned at the meeting." A-1313 (Tavenner FD-302). The District Court found that Senator Menendez's interactions with Ms. Tavenner were not related to her confirmation. On this record, that finding could hardly be considered clearly wrong; thus those interactions are not protected as part of Ms. Tavenner's confirmation process.

Second, Senator Menendez argues that his Chief Counsel's correspondence with a Customs employee was legislative because it was an attempt to gather information. "[F]act-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation," and thus they constitute protected legislative acts. *Lee*, 775 F.2d at 521. Here, the text of the initial communications with Customs appear to request some information from the agency. *See* A-102-03 (Indict. ¶¶ 132-38). But those communications also show that Senator Menendez was asking it to refrain from donating any equipment to the Dominican Republic arguably because this would affect Dr. Melgen's contract. *Id.* Later communications between Senator Menendez's staff and

Customs confirmed that both parties understood that ICSSI, Dr. Melgen's company, was the entity that would suffer from such a donation. *See* A-103 (Indict. ¶¶ 139-42). Because the request for information is so bound up with the advocacy on Dr. Melgen's behalf, it cannot be excised, and the privilege turns on the entire communication's predominant purpose. *See Lee*, 775 F.2d at 525; *Helstoski*, 442 U.S. at 488 n.7. The unrebutted allegations in the Indictment support the District Court's finding that it was not the primary purpose of the Customs communications to gather information in support of future legislation or to engage in policy-based oversight. Thus the District Court's finding falls well short of clear error, and the communications were not protected.

In sum, the materials before us provide a sufficient basis for the District Court's conclusion that the predominant purpose of the challenged acts was to pursue a political resolution to Dr. Melgen's disputes and not to discuss broader issues of policy, vet a presidential nominee, or engage in informal information gathering for legislation. It was not to engage in true legislative oversight or otherwise influence broad matters of policy. No clearly wrong findings exist at this stage, and we will affirm the Court's conclusion that the Speech or Debate Clause does not protect any of the challenged acts.

### B.  The Ethics Act

The Ethics Act is a wide-ranging statute that, among other things, requires Senators to submit certain financial disclosure reports each year to the Secretary of the Senate for review and public distribution by the Senate's Select Committee on Ethics. Count 22 of the Indictment charges Senator Menendez with violating 18 U.S.C. §§ 1001(a)(1) and (c)(1) by knowingly or willfully falsifying, concealing, or covering up the reportable gifts he allegedly received from

Dr. Melgen as part of a bribery scheme. Senator Menendez advances several arguments as to why Count 22 violates the separation of powers among our Branches of Government. We reject each.

First, Senator Menendez maintains that the Executive Branch may not punish any conduct regulated by the Ethics Act because the Senate has incorporated it into Senate Rule 34. Because the Act has been incorporated into the Senate Rules, he reasons that its filing requirements stem from the Constitution's Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member."), and their violation is punishable *only* by the Senate as a transgression of a Senate Rule. *See* Menendez Br. at 48 ("Senators are compelled to complete these reports only because the Senate has exercised its constitutional authority to require them."). In other words, the Ethics Act is unconstitutional as applied to the Senate because "the Rulemaking Clause commits the power to set and enforce ethical standards for Senators to the Senate alone." Menendez Reply Br. at 28.

This contention confuses the relationship between the separation of powers, the Ethics Act, and Senate Rule 34. The Act, which was passed by the full Congress and signed into law by the President, is the source of a Senator's obligation to make financial disclosures. Rule 34 allows the Senate to punish Ethics Act violations; it does not undermine the Executive Branch's authority to prosecute a Senator for those violations. The separation-of-powers principle does not mean that Rule 34 prevents the Executive Branch from enforcing the Act, and the Rulemaking Clause does not bar Congress from legislating ethics. To say otherwise would immunize from prosecution by the Executive Branch any conduct that is incorporated into the Senate Rules, however offensive to the

laws of the United States. Separation of powers requires no such result. Moreover, to the extent the Ethics Act incorporates elements of the Senate Rules—such as permitting Senators to satisfy their Ethics Act obligations on forms created by the Senate, *see* 5 U.S.C. app. 4 § 106(b)(7), or creating a defense to the Act's liability for Senators who rely in good faith on advisory opinions issued by the Senate Select Committee on Ethics, *see United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985) (Scalia, J.)—that is how Congress and the President agreed the Act would operate. It is not a sign that the source of Senator Menendez's filing obligations is Senate Rule 34 or that the Ethics Act criminalizes violations of those Rules as such.

Second, Senator Menendez suggests that Count 22 is non-justiciable (legalese for incapable of being decided by a court) because it requires the Judicial Branch to resolve ambiguities in the Senate Rules. The Judicial Branch is generally capable of interpreting congressional rules. *See Yellin v. United States*, 374 U.S. 109, 114 (1963) ("It has been long settled, of course, that rules of Congress and its committees are judicially cognizable."); *United States v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995) ("[I]t is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules."). Although some Senate Rules may be non-justiciable because they are so vague that the Judicial Branch would essentially make rules for the Senate (and thereby violate the Rulemaking Clause) if it tried to interpret them, *see Rostenkowski*, 59 F.3d at 1306; *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981), Senator Menendez has not identified any particular Senate Rule that would necessarily be interpreted in the course of his prosecution, let alone a Senate Rule that is so vague as to be non-justiciable.

Third, Senator Menendez argues that his Ethics Act disclosures are protected legislative acts under the Speech or Debate Clause. But the "[d]isclosure of income from sources other than employment by the United States" is not a legislative act because it is not "an integral part of the deliberative and communicative processes by which Members participate in committee and [Senate] proceedings." *United States v. Myers*, 692 F.2d 823, 849 (2d Cir. 1982). The cases from the D.C. Circuit on which the Senator relies neither compel us nor convince us to rule that Ethics Act filings are legislative acts. Those cases considered only whether the Clause gave safe harbor to a Member's speech in an official congressional disciplinary proceeding, not whether it protected a Member's Ethics Act filings. *See In re Grand Jury Subpoenas*, 571 F.3d 1200, 1202 (D.C. Cir. 2009); *United States v. Rose*, 28 F.3d 181, 188 (D.C. Cir. 1994); *Ray v. Proxmire*, 581 F.2d 998, 1000 (D.C. Cir. 1978). Indeed, the D.C. Circuit in another case upheld the conviction of a Member of Congress under 18 U.S.C. § 1001 for concealing material facts in an Ethics Act filing. *See Hansen*, 772 F.2d at 943 (Scalia, J.). Hence we rule that Ethics Act filings are not legislative acts protected by the Speech or Debate Clause.

C. Venue for Count 22

Senator Menendez asserts that venue for Count 22 is proper only in Washington, D.C., where he filed the Ethics Act disclosure forms, and New Jersey is thus the wrong place. Because the denial of a motion to dismiss for lack of venue is not immediately appealable, *see, e.g.*, *In re Federal-Mogul Global, Inc.*, 300 F.3d at 378, we allowed Senator Menendez to raise that issue only as a petition for a writ of mandamus ordering that Count 22 be tried in the District of Columbia. He chose not to address the issue of mandamus in his opening brief, stating only that our review of the venue issue is "plenary." Menendez Br. at 3. "When an issue is not pursued

34

in the argument section of the brief, the appellant has abandoned and waived that issue on appeal." *Travitz v. Northeast Dep't ILGWU Health & Welfare Fund*, 13 F.3d 704, 711 (3d Cir. 1994). That is so here.

Even if the issue were not waived, we would deny Senator Menendez's petition. Mandamus is a "drastic remedy that a court should grant only in extraordinary circumstances in response to an act amounting to a judicial usurpation of power." *In re Diet Drugs Prods. Liab. Litig.*, 418 F.3d 372, 378 (3d Cir. 2005). Count 22 alleges that Senator Menendez violated 18 U.S.C. § 1001 when he concealed or covered up material facts *in New Jersey* before he filed his financial disclosures in Washington, D.C. A-135 (Indict. ¶ 271). "At the motion to dismiss stage, the District Court had to accept as true all allegations in the indictment, regardless of its uncertainty as to how the Government would prove those elements at trial." *Bergrin*, 650 F.3d at 270 n.8. The District Court thus did not abuse its discretion or commit a clear error of law when it ruled that the allegation was sufficient to support trial in the District of New Jersey.[3] Additionally, Senator Menendez has not shown that facing trial in New

---

[3] We shall not consider record evidence at this stage of the litigation to assess whether the District Court's venue ruling was an abuse of discretion or clear error. We recognize that "venue must be proper for each count of the indictment," *United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009), and the Government ultimately bears the burden of making that showing by a preponderance of the evidence, *United States v. Perez*, 280 F.3d 318, 330 (3d Cir. 2002). But "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *DeLaurentis*, 230 F.3d at 660.

Jersey as opposed to the District of Columbia would likely cause him irreparable injury or that a post-conviction appeal would be an inadequate remedy for the lack of venue.

## V. Conclusion

We are sensitive that a privilege "is of virtually no use to the claimant of the privilege if it may only be sustained after elaborate judicial inquiry into the circumstances under which the act was performed." *Doe v. McMillan*, 412 U.S. 306, 339 (1973) (Rehnquist, J., concurring in part and dissenting in part). But we also "take seriously the sentiments and concerns of the Supreme Court that Members [of Congress] are not to be 'super-citizens' immune from criminal liability or process." *In re Search of Elec. Commc'ns*, 802 F.3d 516, 531 (3d Cir. 2015) (quoting *Brewster*, 408 U.S. at 516). Senator Menendez's selective reading of the materials in the record does not persuade us that the District Court clearly erred in its findings of fact or that it incorrectly applied any law. That reading may prevail at trial, but at this stage we affirm in all respects.