**FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

ROBERT MENENDEZ and
SALOMON MELGEN,

Defendants.

**OPINION**
Cr. No. 15-155

**Walls, Senior District Judge**

Defendants Senator Robert Menendez ("Menendez") and Doctor Salomon Melgen ("Melgen") (together, "Defendants") move under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. Defendants are charged in an eighteen-count superseding indictment with conspiracy to commit bribery and honest services fraud (Count 1), violating the Travel Act (Count 2), bribery (Counts 3–14), and honest services mail and wire fraud (Counts 15–17). Menendez is additionally charged with making false statements to a government agency (Count 18). After a nine-week trial, the jury failed to reach a verdict on all counts. For the following reasons, the Court denies the motion as to Counts 1–8, 15, 16, and 18, and grants the motion as to Counts 9–14 and 17.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes the parties' familiarity with the facts for the purposes of this motion. As to the procedural history of this case, Defendants were arraigned under a superseding indictment on August 22, 2017. Jury selection began that day, and trial commenced on September 6. On October 11, at the close of the Government's case, Defendants made their first motion for acquittal. Oct. 11, 2017, Tr. at 88; ECF No. 241. Following oral argument and

FOR PUBLICATION

briefing by the parties, the Court denied the motion in part and reserved in part. Oct. 16, 2017,

Tr. at 34–57. Defendants renewed their motion on October 30 at the close of all evidence. ECF

No. 261. In addition, Menendez moved to dismiss Count 18 on the ground that the Government

had not introduced evidence that venue is proper in this District. ECF No. 262. After the jury

deadlocked and the Court declared a mistrial, Defendants again renewed their Rule 29 motion on

November 30. ECF No. 281.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 requires the Court to enter a judgment of acquittal

on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P.

29(a). In ruling on a Rule 29 motion, the Court must determine whether any rational trier of fact

could find proof of Defendants' guilt beyond a reasonable doubt based on the evidence presented

at trial. *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002). In making that determination,

the Court must view the evidence in its entirety and in the light most favorable to the

Government. *United States v. Hoffecker*, 530 F.3d 137, 146 (3d Cir. 2008). That includes giving

"the benefit of inferences that may be drawn from the evidence," which "may be considered

probative even if it is circumstantial." *United States v. Pecora*, 798 F.2d 614, 618 (3d Cir. 1986).

"[A] finding of insufficiency should be confined to cases where the prosecution's failure is

clear." *Smith*, 294 F.3d at 477.

## DISCUSSION

Defendants advance the following arguments in support of their Rule 29(a) motion, made

at the close of the Government's case and renewed at the close of all evidence: (1) that the

Government failed to prove a *quid pro quo* because *McDonnell v. United States* invalidated the

"stream of benefits" theory of bribery, under which the Government brought much of its case;

**FOR PUBLICATION**

(2) that the Government failed to prove an official act satisfying *McDonnell*'s narrowed definition; (3) that inter-branch lobbying can never qualify as an official act; (4) that the Government failed to prove Menendez took an official action that he would not otherwise take; (5) that the counts alleging Majority PAC contributions as bribes are subject to strict scrutiny under *Citizens United* and that this prosecution does not satisfy that heightened requirement; (6) that the Government failed to prove an explicit *quid pro quo* regarding the political contribution counts; (7) that the Travel Act count must fail because the Government failed to prove a subsequent overt act in furtherance of the unlawful activity; and (8) that the false statements count against Menendez must fail because the Government has not proved that his omissions were material and made knowingly or willfully. Following Defendants' presentation of evidence, Menendez made the additional argument that the Government failed to prove by a preponderance of the evidence that venue in this district is proper on the false statements count.

### I.  Bribery Counts.

A public official is guilty of bribery when that person performs or agrees to perform an "official act" in exchange for something of value. 18 U.S.C. § 201(b)(2) (applying to a public official who "directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act"); *see McDonnell v. United States*, 136 S. Ct. 2355 (2016). One who gives or offers a thing of value to a public official is guilty of bribery if he does so "with intent to influence any official act." 18 U.S.C. § 201(b)(1). This requires the Government to prove the existence of a *quid pro quo*, or "a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404–05 (1999) (emphasis in original).

**FOR PUBLICATION**

For a public official to be guilty of bribery, the jury must find that he "agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell*, 136 S. Ct. at 2371. This agreement "need not be explicit and the public official need not specify the means that he will use to perform his end of the bargain." *Id.* It is sufficient if the public official "understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise." *United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017) (quoting *United States v. Bradley*, 173 F.3d 225, 231 (3d Cir. 1999)). Consequently, a jury may find a *quid pro quo* if the Government shows "a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) (emphasis in original) (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)).

First Amendment concerns arise, however, when the alleged thing of value is a political contribution. *United States v. Menendez*, 132 F. Supp. 3d 635, 642 (D.N.J. 2015). To prove that a political contribution was the subject of a bribe, the Government must prove an explicit *quid pro quo. See McCormick v. United States*, 500 U.S. 257, 273 (1991) ("The receipt of such contributions is also vulnerable under the Act . . . , but only if the payments are made in return for an explicit promise or undertaking . . . ."); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) (requiring explicit promise of official action when government alleges that campaign contributions are subject of bribery).

The Supreme Court in *McDonnell* recently narrowed the definition of "official act," holding unanimously that:

> [A]n official act is a decision or action on a 'question, matter, cause, suit, proceeding or controversy.' The 'question, matter, cause, suit, proceeding or controversy' must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing

before a committee. It must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official. To qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official.

136 S. Ct. at 2371–72.

### a. A Rational Juror Could Conclude that Defendants Entered Into an Agreement to Exchange Things of Value for Specific Official Acts.

Defendants assert that the "stream of benefits" theory of bribery is no longer viable in light of *McDonnell*.[1] They argue that after *McDonnell*, the Government must prove that Defendants entered into an agreement to exchange a thing of value for a specific "official act" which was identified at the time of the agreement. The Court concludes that *McDonnell* is not antagonistic to the stream of benefits theory. A reading of the Supreme Court decision reveals an absence of definite conflict between the now-limited definition of official acts of a public official, and the stream of benefits theory, a governmental tool long used to prosecute bribery charges against public officials.

Defendants focus on the Supreme Court's statement in *McDonnell* that the Government must prove that "the public official agreed to perform an 'official act' *at the time* of the alleged *quid pro quo*." *McDonnell*, 136 S. Ct. at 2371 (emphasis added). Defendants argue that this language, in light of *McDonnell*'s narrowing of the term "official act," requires the Government to prove beyond a reasonable doubt that Defendants had an agreement to exchange a specific *quid* for a specific, identified *quo*. The Court is constrained to disagree.

It is established Third Circuit law that:

---

[1] Defendants initially made this argument in their July 18, 2017 motion to dismiss. ECF No. 185. Having reserved judgment on that question until the close of the Government's case, the Court now addresses the issue.

FOR PUBLICATION

> The key to whether a gift constitutes a bribe is whether the parties intended for the
> benefit to be made in exchange for some official action; the government need not
> prove that each gift was provided with the intent to prompt a specific official act.
> Rather, "the *quid pro quo* requirement is satisfied so long as the evidence shows a
> course of conduct of favors and gifts flowing to a public official *in exchange for* a
> pattern of official actions favorable to the donor."

*Kemp*, 500 F.3d at 282 (emphasis in original) (quoting *Jennings*, 160 F.3d at 1014); *see also*

*United States v. Bryant*, 655 F.3d 232, 241 (3d Cir. 2011) ("[P]ayments may be made with the

intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity

presents itself the official will take specific action on the payor's behalf.").

As long as that action is an "official act" under *McDonnell*, it is a crime. Other Circuits

agree. *See, e.g.*, *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (Sotomayor, J.); *Jennings*,

160 F.3d at 1014; *United States v. Whitfield*, 590 F.3d 325, 337–54 (5th Cir. 2009). The Second

Circuit in *Ganim* endorsed the stream of benefits theory while rejecting the precise argument

advanced by Defendants here—"that a specific act [must] be identified and directly linked to a

benefit at the time the benefit is received." *Id.* at 145. Reaffirming that "it is sufficient if the

public official understands that he or she is expected as a result of the payment to exercise

particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise," the

court in *Ganim* identified the stream of benefits theory as "a natural corollary of [*United States

v.*] *Evans*' pronouncement that the government need not prove the existence of an explicit

agreement at the time a payment is received." *Id.* (quoting *United States v. Coyne*, 4 F.3d 100,

144 (2d Cir. 1993)); *see also McDonnell*, 136 S. Ct. at 2371 ("[t]he agreement need not be

explicit").

Defendants' attempt to read inconsistencies between *McDonnell* and the well-established

stream of benefits theory is unpersuasive. Defendants point to two statements from *McDonnell*

and argue that, taken together, they impose a strict nexus requirement between *quid* and *quo*.

**FOR PUBLICATION**

First, they identify the statement that the factfinder must "determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell*, 136 S. Ct. at 2371. They then point to *McDonnell*'s holding that an official act "must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* at 2372.

From these statements, Defendants manufacture a temporal requirement at odds with the stream of benefits theory: that the official act that is the object of a *quid pro quo* must be "specific and focused" and identified at the time the agreement is made. But the two passages Defendants quote from *McDonnell* are distinct. The Government has always been required to prove that a public official "agreed to perform an 'official act' at the time of the alleged *quid pro quo*." As the Third Circuit said in *Kemp*, "[t]he key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action . . . ." 500 F.3d at 282. That the official acts ultimately taken by the public official must be "specific and focused" under *McDonnell* in no way imposes a requirement that they be precisely identified at the time the agreement is made. *See Ganim*, 510 F.3d at 149 (approving jury instruction that "a bribe requires some specific quid pro quo . . . that is, a specific official action in return for the payment or benefit").

Defendants also argue that *McDonnell* forecloses the stream of benefits theory because it clarifies a misreading of *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), that has been adopted by several circuits. In *Sun-Diamond*, the Court held that a gratuity conviction under 18 U.S.C. § 201(c)(1) requires the Government to show "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414. This nexus was required because the gratuities statute prohibits "only

FOR PUBLICATION

gratuities given or received 'for or because of *any official act* performed or to be performed,' and then" proceeds to define "official act." *Id.* at 406 (emphasis in original).

The *Ganim* court rejected Defendants' contention that this nexus requirement applied to bribery cases as well as gratuities. The court observed, "it was the very text of the illegal gratuity statute—'for or because of any official act'—that led the [*Sun-Diamond*] Court to its conclusion that a direct nexus was required to sustain a conviction under § 201(c)(1)(A)." *Ganim*, 410 F.3d at 146. Moreover, the court reasoned that while that nexus is necessary "to distinguish legal gratuities (given to curry favor because of an official's position) from illegal gratuities (given because of a specific act)," it "is not needed in the extortion or bribery contexts . . . because it is the requirement of an intent to perform an act in exchange for a benefit—i.e., the *quid pro quo* agreement—that distinguishes those crimes from both legal and illegal gratuities." *Id.* at 146–47.

Defendants contend that *Ganim*'s reliance on the distinction between gratuities and bribery cases is a misreading of *Sun-Diamond*. They argue that *McDonnell* clarified this misreading by adopting *Sun-Diamond's* interpretation of "official act," thereby incorporating its requirements wholesale in all cases brought under section 201. ECF NO. 177-1, at 5; *see McDonnell*, 136 S. Ct. at 2370 ("It is apparent from *Sun-Diamond* that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action' within the meaning of § 201(a)(3) . . . .").

But *McDonnell*'s adoption of *Sun-Diamond*'s "official act" interpretation—contained in section 201(a)(3) and applicable to both the bribery and gratuities provisions—does not also incorporate its interpretation of section 201(c)(1)(A), which is part of the distinct gratuities provision. As *Ganim* observed, the nexus requirement in *Sun-Diamond* was a construction of the causal nature of "for or because of any official act," which does not appear in the bribery

FOR PUBLICATION

provision, section 201(b)(2). Because both crimes require a definition of "official acts," there is no reason to think that the interpretation of section 201(a)(3) in *Sun-Diamond* would not apply in the bribery context as well.

*McDonnell* neither abolished the stream of benefits theory nor held that an official act that is the object of an illegal *quid pro quo* agreement must be identified at the time the agreement is made. It merely narrowed the definition of "official act"; the opinion says nothing new about what nexus must be shown between a thing of value and an official act. In other words, *McDonnell* is about the *quo*, not the *pro*.

Against the backdrop of established Third Circuit authority approving the stream of benefits theory, *McDonnell*'s silence regarding that theory cannot be its death knell. The Court is bound to follow controlling Third Circuit authority, and it does here. *See United States v. Mitlo*, 714 F.2d 294, 298 (3d Cir. 1983) (quotations omitted) ("[A] decision by this court, not overruled by the Supreme Court[,] is a decision of the court of last resort of this federal judicial circuit and is therefore binding on all inferior courts and litigants in the Third Judicial Circuit . . . ."). This is particularly so given the widespread acceptance of the stream of benefits theory pre-*McDonnell*, and the fact that the Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). That Justice Sotomayor, who authored the lodestar stream of benefits opinion as a judge on the Second Circuit, joined the Court in *McDonnell* further weakens Defendants' argument that *McDonnell* silently overruled the stream of benefits theory of bribery.[2]

---

[2] At oral argument in *McDonnell*, counsel for the Government argued that if the Court were to find that the acts in question were not "official acts," the appropriate remedy was a remand and not reversal. Counsel made this argument based on *Ganim*'s theory of corruption, which he discussed for forty-nine lines without interruption or question. Tr. at 55.

**FOR PUBLICATION**

Indeed, post-*McDonnell*, the Third Circuit and other Circuit courts have continued to cite favorably to their own stream of benefits precedents, indicating their view that the Supreme Court left the theory intact. *See United States v. Skelos*, Nos. 16-1618, 16-1697, 2017 WL 4250021 at *3 (2d Cir. Sept. 26, 2017) (quoting *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011)) ("Acts constituting the agreement need not be agreed to in advance. A promise to perform such acts as the opportunities arise is sufficient."); *Repak*, 852 F.3d at 251 (quoting *Bradley*, 173 F.3d at 231) (for Hobbs Act violation "it is sufficient if the public official understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise"); *see also United States v. Malkus*, No. 12-56499, 2017 WL 3531422 at *1 (9th Cir. Aug. 17, 2017) ("*McDonnell* did not change the 'linkage' requirement of federal bribery statutes . . . .").

In light of the stream of benefits theory's continued vitality, the Court also concludes that a rational juror could find that Defendants entered into a *quid pro quo* agreement. All of Menendez's alleged official acts occurred during the relatively short period of January 2006 through January 2013, and during the same period Melgen gave Menendez a stay in an upscale Parisian hotel, various flights without cost, and stays at Melgen's villa in the Dominican Republic. During this same period of time, there is evidence that Menendez reached his highest public office, that of the United States Senate, and became a member of the Finance and Foreign Relations Committees. A rational juror could conclude from the activities of these defendants that there was an implicit agreement to exchange things of value for official acts. *See McDonnell*, 136 S. Ct. at 2371 ("The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.").

**FOR PUBLICATION**

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### b.  A Rational Juror Could Find That Senator Menendez Performed Official Acts Satisfying the *McDonnell* Standard.

In this case, there are four incidents from which a rational juror could conclude official acts arise: Menendez's visa-related advocacy, his advocacy relating to Melgen's Medicare billing dispute, his advocacy concerning Melgen's contract to provide security services to Dominican Republic ports (the "ICSSI contract"), and his opposition to the United States government's potential gift of security screening technology to the Dominican Republic government.

Viewing the evidence, as the Court must, in the light most favorable to the Government, each of these incidents has a common thread. That is, during the period of January 2006 through January 2013, there is evidence to sustain the determination that Menendez sought to "exert pressure on" or "advise" other government officials to take official actions for Melgen's benefit. *McDonnell*, 136 S. Ct. at 2372.

There is available evidence that, with regard to the visas, Menendez by phone call or by correspondence interceded with appropriate State Department officials to obtain favorable consideration of visa applications made by Melgen's friends. *See, e.g.*, GX 20; GX 25; GX 30.

As to the Medicare billing dispute, there is evidence to indicate a controversy as to billing practices between Melgen and Medicare, which amounted to $8.9 million. Sept. 26, 2017, Tr. at 191. There is evidence to support the conclusion that from 2009 to August 2012, at various times and with various representatives of Medicare and with cabinet officials, Menendez sought to pressure or advise such officials to look at the controversy favorably to Melgen by making personal phone calls to officials in the Department of Health and Human Services, which has overall direction of Medicare policy, and meeting with the then-secretary of that agency in

FOR PUBLICATION

August 2012. *See, e.g.*, Oct. 2, 2017, Tr. at 82 (2009 phone call with Jonathan Blum); Oct. 3, 2017, Tr. at 179, 187 (August 2012 meeting with Kathleen Sebelius and others). There is evidence from which a rational juror could conclude that the meeting was not regarding general policy matters, but was in reality about securing a favorable ruling or decision for Melgen, who was the only doctor seeking to change that particular policy, and who had $8.9 million at stake. *See* Oct. 2, 2017, Tr. at 101.

With regard to the port security contract, during the period from January 2006 through January 2013, Melgen was the owner of a company which held a contract to provide security services in the harbor of a port in the Dominican Republic. Sept. 25, 2017, Tr. at 134–40. There was a dispute between his company and the Dominican Republic over the enforceability of that contract. *Id.* From the evidence at trial, a rational juror could conclude that Menendez sought through meetings with various State Department officials, including those of ambassadorial rank, to pressure or advise them to take official action which would be beneficial to his friend's contract. *Id.*; GX 138.

Finally, to further aid his friend and his contract, there is evidence available from which a rational juror could conclude that Menendez sought to pressure or advise another government agency to desist in giving a gift of security scanning equipment until Menendez could discuss the issue with them. Sept. 25, 2017, Tr. at 134–37.

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### c. Inter-Branch Lobbying Can Qualify as an Official Act Under *McDonnell*.

Defendants next argue that acquittal on Counts 1–17 is required because inter-branch lobbying can never be an "official act." ECF No. 241-1, at 49. They contend that because the

FOR PUBLICATION

official acts alleged in this case involve decisions by the executive branch, Menendez, a legislative branch official, cannot have accepted a gift in return for "being influenced in the performance of any official act." *Id.* (quoting 18 U.S.C. § 201(b)(2)(A)).

The *McDonnell* framework for identifying an official act first requires that there be a "question, matter, cause, suit, proceeding or controversy," and second requires that the public official "make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy.'" *Id.*; *see United States v. Boyland*, 862 F.3d 279, 289 (2d Cir. 2017) (articulating *McDonnell*'s two-part framework). Even if the public official does not himself make a decision or take an action, the second requirement may be satisfied when the official (1) exerts pressure on another public official to perform an official act, or (2) provides advice, knowing or intending that such advice will form the basis for an official act. *McDonnell*, 136 S. Ct. at 2372.

Defendants argue that inter-branch lobbying cannot constitute an "official act" because such lobbying can never "form the basis" for an official act. Because *McDonnell* did not limit the scope of "official act" in this way, this argument fails. First, the language of *McDonnell* requires that a public official who advises another official know or intend that his advice will "form the basis" for an official act, but does not impose such a limitation when the public official engages in an official act by "exert[ing] pressure." The two alternatives are set out in separate sentences, and the "exert[ing] pressure" sentence does not require that the public official know or intend that the pressure "form the basis" of the ultimate official act. *Id.* at 2370. Consequently, the Government is not required to prove that a public official knew or intended that inter-branch advocacy would "form the basis" for any official act if such advocacy comes in the form of "exert[ing] pressure." *Id.*

13

FOR PUBLICATION

Second, it is certainly possible for inter-branch advocacy to "form the basis" for an official act. Defendants essentially acknowledge this when they posit a hypothetical in which a senator persuades the President to veto a bill, and argue that it would not constitute an official act. ECF No. 241-1, at 52. If, as they suggest, a senator in fact convinced the President to veto a bill he otherwise would have signed, then the pressure would have "formed the basis" for the official act under any reasonable understanding of that phrase.

Defendants further argue that limiting *McDonnell*'s "exert[] pressure" and "advise" language to intra-branch advocacy is necessary to prevent its application from being overbroad. ECF No. 241-1, at 52. The Court disagrees. *McDonnell* carefully drew the line between advocacy that could serve as an "official act" and advocacy that could not. The Chief Justice laid out multiple limitations on this type of official action.

An official does not take an "official act" by "[s]imply expressing support [for an official act] . . . as long as the public official does not intend to exert pressure on another official . . . ." *McDonnell,* 136 S. Ct. at 2371. While "exert[ing] pressure" may constitute an official act, "expressing support" cannot. *Id.* Further, exerting pressure is an official act only when the official uses his "official position." *Id.* Similarly, providing advice can be an official act only when the official "know[s] or intend[s] such advice [will] form the basis for an 'official act.'" *Id.* Finally, both alternatives are cabined by the Court's limitation that an official act involve a "formal exercise of governmental power that is similar in nature to a lawsuit," that it be "specific and focused," and that it be "'pending' or 'may by law be brought' before another public official." *Id.* at 2372.

Under Defendants' reading, it would be per se legal to give the President a thing of value to influence him to pressure the Senate Majority Leader to vote or not vote for a particular bill.

FOR PUBLICATION

This cramped reading of *McDonnell* is contrary to the purpose of section 201 and the language of the *McDonnell* Court. Given the clear limitations in the *McDonnell* opinion, Defendants' reading is not necessary to save its application from overbreadth.

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### d. A Rational Juror Could Find that Melgen Gave Menendez Gifts Intending that Menendez Take Official Actions He "Would Not Otherwise Take."

Defendants next argue that acquittal is required on Counts 2–17 because the Government failed to prove that that either defendant had the specific intent to commit bribery. ECF No. 241-1, at 43. Specifically, they argue that the Government failed to introduce evidence that Menendez took official action that he would not otherwise take.

In explaining the requisite intent to commit bribery, the Third Circuit has stated that the Government must prove that "the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take." *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012).[3]

Defendants rely on this language to argue that the Government must show that Menendez "accepted a bribe with the intent to take favorable official acts that he would not otherwise take." Oct. 11, 2017, Tr., at 208. As the Court has stated, that language describes the requisite intent of the payor, not the public official. Nov. 11, 2017 Tr. at 57. The Third Circuit stated that "[the factfinder] must conclude that *the payor* provided a benefit to a public official intending that he

---

[3] That case involved honest services fraud, and the Court assumes without deciding that the standard articulated in *Wright* is applicable to section 201 as well. It is possible that some aspects of *Wright*'s articulation of the requisite intent do not survive *McDonnell*. *Wright* stated that the Government must prove that the "official accepted [things of value] *intending*, in exchange for the benefits, *to take official acts* to benefit the payor." 665 F.3d at 568 (emphasis added). In contrast, the Chief Justice in *McDonnell* stated that the public official "need not . . . *in fact intend to perform the 'official act*,' so long as he agrees to do so." 136 S. Ct. at 2371 (emphasis added).

will thereby take favorable official acts that he would not otherwise take." *Wright,* 664 F.3d at

568 (emphasis added). In contrast, the court went on to say that the factfinder "must conclude

that the *official* accepted those benefits intending, in exchange for the benefits, to take official

acts to benefit the payor." *Id.* (emphasis added).

Consequently, the "would not otherwise take" standard applies only to Melgen. As to

him, Defendants argue that a jury could find only that Melgen provided the things of value as a

reward, but not as an attempt to influence. They therefore argue that this would constitute only a

gratuity, and not a bribe. ECF No. 241-1, at 44.

From the evidence introduced at trial, viewed in the light most favorable to the

Government, a rational juror could find that Melgen had the intent to influence Menendez in the

performance of official acts, regardless of Menendez's earlier advocacy. With regard to the

Medicare billing dispute, it is true that Menendez had taken steps to help Melgen before the

alleged bribe. That does not mean, however, that Menendez remained willing to intercede again

on Melgen's behalf. A rational juror could infer that Melgen provided things of value with the

intent to influence Menendez to take up the issue again, believing that he otherwise would not

have done so. Further, Menendez's 2009 advocacy is itself charged as an official act in a bribery

scheme, *see* ECF No. 149, at ¶¶ 146–82, and there is no reason to conclude that, if that advocacy

was the result of a bribe, Melgen believed he no longer had to pay Menendez for further

advocacy in 2012.

With regard to the Brownfield meeting, Defendants argue that Melgen cannot have made

the May 16, 2012 contribution with the intent to influence Menendez because, when Melgen

agreed on May 11 to make the contribution, Menendez had already scheduled the meeting. ECF

No. 241-1, at 47. However, the Government introduced evidence from which a rational juror

FOR PUBLICATION

could infer that Melgen had already agreed to make the contribution before Menendez scheduled the Brownfield meeting. *See, e.g.*, GX 133 (April 30 email from Eduardo Rodriguez (Melgen's son-in-law and employee) to Daniel O'Brien (Menendez's chief of staff) stating "don't worry . . . [w]e will take care of [the contribution]"). Because the relevant timing in a bribery case is that of the agreement (and not any resulting exchange), a rational juror could find that Melgen made the May 16 contribution with the intent to influence Menendez to advocate for him with Brownfield. *See United States v. Young*, 651 Fed. Appx. 202, 204 (4th Cir. 2016) ("[T]he timing of the payment in relation to the official act for which it is made is (in theory) irrelevant." (quoting *Jennings*, 160 F.3d at 1014)); *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (emphasizing that the time of the agreement is the pertinent inquiry, not the time of the payment). Defendants also argue, as with the Medicare dispute, that Menendez's earlier advocacy with regard to the ICSSI contract is conclusive evidence that Melgen did not have the intent to influence because Menendez would take the requested action without receiving a thing of value. The Court rejects this argument for the same reasons.

With regard to the visa applications, Defendants argue that Menendez's similar advocacy for other visa applicants is conclusive evidence that Melgen did not have the intent to influence Menendez in the performance of official acts. ECF No. 241-1, at 48. Defendants point to evidence in the record indicating that visa-related advocacy by Menendez and other senators is not unusual. However, that Menendez provided similar assistance to others is not evidence that would preclude a juror from finding that Melgen believed that offering things of value would influence Menendez. There is no evidence that Melgen was aware of Menendez's similar efforts for others, such that he could expect Menendez's assistance in three separate visa matters as a

FOR PUBLICATION

matter of course. "It goes without saying that matters of intent are for the jury to consider."

*McCormick*, 500 U.S. at 270 (citing *Cheek v. United States*, 498 U.S. 192, 203 (1991)).

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed

Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### e.   *Citizens United* Does Not Bar the Prosecution of Bribery Schemes Involving Contributions to Super PACs.

Defendants move for acquittal on Counts 1, 11–14, and 17 (the "political contribution

counts"), arguing that they rely on contributions made to Majority PAC, a Super PAC, "and the

Supreme Court has held that, as a matter of law, independent expenditures cannot give rise to

corruption or the appearance of corruption." ECF No. 241, at 40. Absent evidence of

coordination between Majority PAC and the Menendez campaign, according to Defendants,

Melgen's contributions to it "cannot be sufficiently valuable to [Menendez] in a way that might

ever lead to *quid pro quo* corruption." *Id.* at 42. Before trial, the Court rejected nearly identical

arguments made by Defendants in support of a motion to dismiss the indictment. *See* ECF No.

119, at 2–7. No different conclusion is required now.

The Supreme Court in *Citizens United v. Federal Election Commission*, 558 U.S. 310,

318–19 (2010) invalidated a federal law prohibiting corporations from making independent

political expenditures. In doing so, the Court considered the Government's interest in limiting

independent expenditures "to prevent corruption or its appearance," *id.* at 356, and determined

that the law at issue would "have a chilling effect [on political speech] extending well beyond the

Government's interest in preventing *quid pro quo* corruption," *id.* at 357. It reasoned that "[t]he

absence of prearrangement and coordination of an expenditure with the candidate or his agent

not only undermines the value of the expenditure to the candidate, but also alleviates the danger

that expenditures will be given as a *quid pro quo* for improper commitments from the candidate."

FOR PUBLICATION

*Id.* Defendants seize upon this language, arguing that "[b]ecause the prosecution failed to offer any evidence that Majority PAC improperly coordinated with any campaign, such that its activities would cause its expenditures to lose their protected 'independent' status, the First Amendment requires an acquittal on these counts as a matter of law." ECF No. 241, at 40.

Here, the Government alleges that Defendants engaged in a *quid pro quo* bribery scheme, not that either defendant violated campaign finance regulations. In other words, the charges in this case concern bribery, not political speech. *See United States v. McGregor*, No. 10-186, 2011 WL 1576950, at *3 (M.D. Ala. Apr. 4, 2011) ("If at trial the Government can show that there was a bribery scheme to deprive the citizenry of honest services, then Defendants' conduct, not their speech, will have been regulated by the statute."). As the Court held before trial, nothing in *Citizens United* or related cases implies a First Amendment bar to bribery prosecutions. *See* ECF No. 119, at 3–4. On the contrary, those decisions suggest an ongoing concern with precisely the type of dollars-for-official-action exchange that is at the core of the Government's allegations in this case. *See Citizens United*, 558 U.S. at 360 ("If elected officials succumb to improper influences from independent expenditures . . . then surely there is cause for concern."); *McCutcheon v. FEC*, 134 S. Ct. 1434, 1450 (2014) ("Spending large sums of money in connection with elections, *but not in connection with an effort to control the exercise of an officerholder's official duties*, does not give rise to *quid pro quo* corruption.") (emphasis added).

Defendants also suggest that because Menendez lacked control over the final disposition of Melgen's Majority PAC contributions, those contributions can never be "anything of value" under 18 U.S.C. § 201. This contention is based on the Supreme Court's reasoning in *Citizens United* that independent expenditures had insufficient actual value to candidates to raise concerns of *quid pro quo* corruption because of the "absence of prearrangement and coordination of an

19

FOR PUBLICATION

expenditure with the candidate." 558 U.S. at 357 (quoting *Buckley v. Valeo*, 424 U.S. 1, 47

(1976)). The passage in *Buckley* cited in *Citizens United* noted that, because of this lack of

coordination, independent expenditures "may well provide little assistance to the candidate's

campaign and may prove counterproductive." *Buckley* 424 U.S. at 47. In other words, an

independent expenditure may not *necessarily* be valuable to a particular candidate. Yet, as this

Court held before trial, a donation to an independent Super PAC can constitute "anything of

value" for at least two reasons. *See* ECF No. 119, at 4–7.

First, "value" for the purposes of section 201 is subjective. *See Kemp*, 500 F.3d at 285

(citing authorities from other circuits "focus[ing] on the value that the recipient 'subjectively

attache[d] to the items received'" (quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th

Cir. 1986))); *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (noting that "anything of

value" is "defined broadly to include 'the value which the defendant subjectively attaches to the

items received'" (quoting *Gorman*, 807 F.2d at 1305)); *United States v. Williams*, 705 F.2d 603,

623 (2d Cir. 1983) ("Corruption of office occurs when the officeholder agrees to misuse his

office in the expectation of gain, whether or not he has correctly assessed the worth of the

bribe.").

Second, section 201 explicitly reaches things of value given to third parties if they are

sought by or promised to a public official in connection with the performance of an official act.

18 U.S.C. § 201(b)(1) (criminalizing the making of a corrupt promise to a public official "to give

anything of value *to any other person or entity*, with intent to influence any official act")

(emphasis added); *id.* § 201(b)(2) (criminalizing the seeking by a public official of "anything of

value *personally or for any other person or entity*, in return for being influenced in the

performance of any official act") (emphasis added).

**FOR PUBLICATION**

Based on the evidence adduced at trial, a rational juror could find that Melgen's contributions to Majority PAC constituted "anything of value" within the meaning of 18 U.S.C. § 201 because there was ample evidence available from which it could conclude either that Menendez placed subjective value on Melgen's Majority PAC contributions, or that Menendez (or his agents) solicited Melgen's contributions to Majority PAC. *See, e.g.*, GX 133 (April 30, 2012 email from Daniel O'Brien to Eduardo Rodriguez, subject "humbly asking," requesting contributions to the NJDSC, which "is vital to the Senator's efforts as the state party will conduct voter contact and get out the vote activities on behalf of Senator Menendez," and informing him that "there may be bigger opportunities out there for the doctor to join in later this summer that will be beneficial to the Senator's re-election effort"); Oct. 4, 2017, Tr. at 6–9 (Franz Katz Watson testifying that she was "hired to oversee the fundraising operation" for Menendez for Senate and organized the June 1, 2012 Pegasus fundraiser at which Melgen made a $300,000 contribution earmarked for New Jersey); *id.* at 31–32 (Franz Katz Watson testifying that the year before and year of Senatorial election are "in cycle" in fundraising terms); *id.* at 89 (Jacob Perry testifying Melgen gave $600,000 to Majority PAC "earmarked for New Jersey"); *id.* at 102 (Jacob Perry testifying that Menendez's was the only New Jersey Senate race in 2012, and that money given to Majority PAC and earmarked for New Jersey would benefit Menendez); GX 199 (June 1, 2012 email from Scarinci to Melgen attaching flyer explaining that "Majority PAC may directly advocate for candidates we support"); GX 202 (check slip for Melgen's June 1, 2012 $300,000 contribution to Majority PAC reads "for B. Menendez"); GX 232 (October 12, 2012 $300,000 check sent from Scarinci's law firm to Craig Varoga, who forwards to Jacob Perry with subject line "Entire $300k to Majority PAC is earmarked for New Jersey").

FOR PUBLICATION

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed

Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### f. A Rational Juror Could Not Find an Explicit *Quid Pro Quo* on the Political Contribution Counts.

Defendants argue that acquittal on the political contribution counts is required because

the Government did not prove an explicit *quid pro quo*. Specifically, Defendants argue that the

Government relies on "chronology alone," and improperly asks the jury to infer an explicit *quid

pro quo* based solely on a temporal relationship between the political contributions and official

acts. ECF No. 241-1, at 35–36.

The Government responds that the evidence at trial satisfies the nexus requirement for the

political contribution counts. Specifically, the Government contends that in addition to a strong

temporal connection, an explicit *quid pro quo* is demonstrated through context, chronology,

escalation, concealment, and a pattern of corrupt activity. ECF No. 251, at 4.

"Section 201 prohibits *quid pro quo* corruption—the exchange of a thing of value for an

'official act.'" *McDonnell*, 136 S. Ct. at 2372. For most things of value, "proof of an explicit

promise to perform the official acts in return for the payment is not required." *Bradley*, 173 F.3d

at 231 (quoting *United States v. Delano*, 55 F.3d 720, 731 (2d Cir. 1995)). Instead, all that is

required is that a "public official has obtained a payment to which he was not entitled, knowing

that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268

(1992); *see United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) *abrogated on other grounds

by McDonnell*, 136 S. Ct. 2355, *as recognized in United States v. Silver*, 864 F.3d 102, 119 &

n.88 (2d Cir. 2017) (rejecting argument that explicit *quid pro quo* is required outside the

campaign contribution context); *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013)

(same); *Kemp*, 500 F.3d at 282 (3d Cir. 2007) (holding, outside the campaign contribution

FOR PUBLICATION

context, that "the quid pro quo requirement is satisfied so long as the evidence shows a 'course of conduct' of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor" (quoting *Jennings*, 160 F.3d at 1014)).

However, First Amendment values are implicated when the thing of value is a political contribution. *Menendez*, 132 F. Supp. 3d at 642. Consequently, to prove that a political contribution was the subject of a bribe, the Government must prove an explicit *quid pro quo*.[4] *See McCormick*, 500 U.S. at 273 ("The receipt of such contributions is also vulnerable under the Act . . . , but only if the payments are made in return for an explicit promise or undertaking . . . ."); *Siegelman*, 640 F.3d at 1171 (requiring explicit promise of official action when government alleges that campaign contributions are subject of bribery); *United States v. Inzunza*, 638 F.3d 1006, 1013 (9th Cir. 2011) (same); *cf. United States v. Salahuddin*, 765 F.3d 329, 343 n.9 (3d Cir. 2014) (limiting requirement of explicit *quid pro quo* to campaign contribution context); *Bradley*, 173 F.3d at 231 (same); *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir. 1993) (same).

While the *quid pro quo* must be explicit, it need not be express; political contributions may be the subject of an illegal bribe even if the terms are not formalized in writing or spoken out loud. *See Siegelman*, 640 F.3d at 1171; *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994); *Menendez*, 132 F. Supp. 3d at 641. As this Court has noted, "explicit" refers "not to the form of the agreement between the payor and payee, but the degree to which the payor and the payee were aware of its terms . . . ." *Menendez*, 132 F. Supp. 3d at 641 (quoting *Blandford*, 33

---

[4] Both *McCormick* and *Evans* were brought as extortion cases under the Hobbs Act. However, due to the First Amendment values at stake, this Court will apply those principles to section 201 as a matter of statutory interpretation. *Menendez*, 132 F. Supp. 3d at 642; *see United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (noting the similarity between Hobbs Act extortion and bribery, and noting that courts "should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act").

FOR PUBLICATION

F.3d at 696); *see United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) ("In our view, what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain.").

A close temporal relationship between political contributions and favorable official action, without more, is not sufficient to prove the existence of an explicit *quid pro quo*. *See Siegelman*, 640 F.3d at 1171 ("In the absence of such an agreement on a specific action, even a close-in-time relationship between the donation and the act will not suffice."); *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1035 (N.D. Ohio 2013) ("Close-in-time contributions, standing alone, will not suffice to establish a *quid pro quo* agreement."). "To hold illegal an [official action] furthering the interests of some constituents shortly before or after campaign contributions are solicited and received 'would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable . . . .'" *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 731 (7th Cir. 2014) (*quoting McCormick*, 500 U.S. at 272).

The relevant inquiry to determine if the Government has met its burden with respect to the political contribution counts is whether a rational juror could find that there was a *quid pro quo*, and that the charged Defendant was aware of its terms. While the "jury may consider both direct and circumstantial evidence, including the context [of the arrangement]," *Carpenter*, 961 F.2d at 827, the Government must produce evidence other than a close temporal relationship to overcome this heightened burden. *See Siegelman*, 640 F.3d at 1171.

The charged political contributions fall into three general categories: a $60,000 contribution to the New Jersey Democratic State Committee (the "NJDSC") and the Fund to Uphold the Constitution (the "Fund") on May 16, 2012 (Counts 9 and 10); a $300,000

24

**FOR PUBLICATION**

contribution to Senate Majority PAC earmarked for New Jersey on June 1, 2012 (Counts 11, 12, and 17); and another $300,000 contribution to Senate Majority PAC earmarked for New Jersey on October 12, 2012 (Counts 13 and 14). The Court will address these in turn.

### i.   Counts 9 and 10: $60,000 to NJDSC and the Fund

Counts 9 and 10 charge Menendez and Melgen, respectively, with agreeing to exchange contributions of $60,000 to the NJDSC and the Fund for advocacy to the highest levels at the State Department on behalf of Melgen in his dispute with the Dominican Republic government regarding the ICSSI contract.[5] This advocacy culminated in a meeting between Menendez and then-Assistant Secretary of State for the Bureau of International Narcotics and Law Enforcement Affairs ("INL") William Brownfield on May 16, 2012.

The first request for the $60,000 came in December 2011, when Menendez fundraiser Kory Vargas Caro sent an email to Eduardo Rodriguez asking "whether or not you and the family can help the New Jersey Democratic State Committee (NJDSC)." GX 254. Later that day, Caro emailed Daniel O'Brien, stating that Rodriguez "[c]alled me back and said Dr. Melgen wants to first talk to [Menendez] before writing the checks." He went on to say that "[t]his is standard Dr. Melgen." GX 255.

Despite his apparent willingness, Melgen did not provide the requested donation. On April 30, Menendez's staff made a second request for the $60,000 in an email from O'Brien to Rodriguez, with the subject line "Humbly Asking." GX 133. The email requested that Melgen and his family donate $40,000 to the NJDSC, and $20,000 to the Fund. *Id.* The email also indicated that there would be "bigger opportunities out there for the doctor [Melgen] to join later

---

[5] This Court has already ruled that the heightened standard of *McCormick* applies to contributions made to the Fund. *Menendez*, 132 F. Supp. 3d at 642–43.

**FOR PUBLICATION**

this summer that will be beneficial to the Senator's re-election effort." *Id.* Rodriguez responded:

"We will take care of it. Dr. Melgen will be calling you tomorrow to speak further." *Id.*

Menendez had first raised the port security issue with INL when he met with Brownfield on September 21, 2011. Menendez recommenced his advocacy on May 10, 2012, shortly after O'Brien's second request for the $60,000 contribution. Menendez's staff member Jodi Herman contacted INL to set up a meeting with Brownfield to discuss "DR (cargo from [Dominican Republic] coming into US ports)." GX 134; Sept. 28, 2017, Tr. at 171; Sept. 26, 2017, Tr. at 53. INL staff asked Herman to be more specific about the subject of the requested meeting, but she was unable do so, stating: "I had to drag even this information out of him. He was just in the [Dominican Republic] for a personal visit and imagine he has some observations to share . . . ." GX 134.

Later that day, Melgen spoke on the phone with O'Brien. GX 136. O'Brien followed up with Melgen the next day by emailing Rodriguez, and indicated that Melgen had agreed to make the $60,000 contribution. *Id.*

On May 12, Menendez emailed O'Brien to ask him what the balance in the NJDSC account was at that time. GX 135. Melgen still had not made the requested contribution. GX 136.

On May 15, Rodriguez told O'Brien that he would send the contributions to O'Brien's home. *Id.*; Oct. 2, 2017, Tr. at 8. The same day, Melgen expressed a desire to speak with O'Brien to "verify some info for contributions." GX 137.

On May 16, Menendez met with Brownfield. Menendez expressed dissatisfaction with INL's level of engagement in the Dominican Republic, and the Senator asked that INL report back no later than July 1 with a "clear deliverable that is already in place or being implemented." GX 138. Menendez threatened to hold a hearing if INL failed to come up with a solution. *Id.*;

Sept. 26, 2017, Tr. at 79–80. Brownfield believed Menendez "was alluding to" the ICSSI contract that Menendez raised with him in September 2011. GX 138.

Also on May 16, Melgen issued three checks, each for $20,000. Two were drawn from the account of Salomon and Flor Melgen. GX 143; GX 142. The third was from Melgen's daughter and son-in-law, Melissa Melgen and Eduardo Rodriguez. GX 140. That day, Melissa also received a check for $20,000 from Melgen's company, Vitreo-Retinal Consultants ("VRC"). GX 139. The word "salary" was written in the memo line. *Id.* That evening, Rodriguez emailed O'Brien with the Fedex tracking information, informing him that the contributions had been sent to his house for overnight delivery. GX 141.

From this evidence, a rational juror could not find that Menendez and Melgen were aware of the terms of the alleged *quid pro quo*. There is no evidence that either defendant connected the $60,000 contribution with the Brownfield meeting or other advocacy to the Department of State. There is no evidence that the Defendants even discussed the ICSSI contract during this time. The evidence shows only that Melgen's staff was discussing the contribution with Menendez fundraisers during an election season.

There is evidence that Melgen spoke with O'Brien on the phone during this period, and that Melgen had expressed a desire to speak with Menendez in December 2011. However, there is no evidence about what was discussed during those phone calls. A rational juror could only speculate as to whether Defendants discussed the ICSSI contract, or that they did so in connection with the contribution, from the simple fact that a phone call occurred. In *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014), the Seventh Circuit considered a RICO claim alleging that then-Governor Blagojevich received campaign contributions from horse-racetrack owners in exchange for signing two bills into law, one in 2006 (the "'06 Act")

FOR PUBLICATION

and one in 2008 (the "'08 Act"). The court affirmed summary judgment in favor of the defendant Governor as to the '06 Act, finding insufficient evidence of an explicit *quid pro quo*. *Id.* at 731. The '06 Act initially stalled in the legislature, and the Governor met with the racetrack owners during this time. The Governor then expressed support for the bill on the floor of the legislature. *Id.* at 725–26. The Governor signed the bill into law the day after it passed, and the racetrack owners sent him a "thank-you" note and a $125,000 campaign contribution a day later. *Id.* The court reasoned that because there was no evidence of the contents of the meeting, and because the "thank-you" note did not suggest the existence of an agreement, a reasonable juror could not find an explicit *quid pro quo*. *Id.* at 731.

However, the court found sufficient evidence of an explicit *quid pro quo* as to the '08 Act. *Id.* at 731. That bill passed the legislature easily, but the Governor refused to sign it. The racetrack owners were anxious to have the bill signed, and asked the Governor's staff member if they needed to "put a stronger bit in [the Governor's] mouth!?!" *Id.* at 726. Instead of signing the bill, the Governor instructed his staff to approach the donors to tell them that "once [they] made the contribution, the act would be signed." *Id.* at 725. From this, the court reasoned that a rational juror could find that the Governor was aware of the terms of the agreement: a $100,000 contribution in exchange for a signature. *Id.* at 732.

As with the meeting in *Empress Casino*, there is no evidence of what was said on any phone call between Melgen and O'Brien. There is no evidence that a phone call with Menendez ever transpired. Given this absence of evidence, there is nothing to view in the light most favorable to the Government. A rational juror could not infer an explicit *quid pro quo*. *See id.*; *Inzunza*, 638 F.3d at 1025 (finding no explicit *quid pro quo* despite evidence of campaign

28

contributions and favorable official acts, stating "we know nothing of what transpired at [the defendant's] half-hour meeting with Malone at the 2001 fundraiser").

Similarly, that Menendez checked the balance of the NJDSC account during this time does not demonstrate that Menendez was aware of the terms of the *quid pro quo*. There is no evidence that he was particularly checking for Melgen's donation, or that he connected the donation to the Brownfield meeting.

The only evidence connecting the contributions to the meeting is that they occurred on the same day. However, "a close-in-time relationship between the donation and the act will not suffice [to prove an explicit *quid pro quo*]." *Siegelman*, 640 F.3d at 1171; *see Empress Casino*, 763 F.3d at 731. In *Empress Casino*, the court found that a jury could not infer an explicit *quid pro quo* despite the fact that the political contribution alleged to be a bribe occurred one day after the official act. Similarly, without evidence of any communication between Defendants about the ICSSI contract, or any connection between the Brownfield meeting and the political contribution, even a close temporal relationship is not enough for a jury to infer an explicit *quid pro quo*.

Viewed in the light most favorable to the Government, none of the other evidence demonstrates an explicit *quid pro quo*. The Government alleges that a jury may infer an explicit *quid pro quo* from "context." Specifically, it argues that the jury can infer an explicit *quid pro quo* because Melgen did not agree to provide the contribution until after Menendez had scheduled the meeting with Brownfield. ECF No. 251, at 6.

The Government has not introduced evidence that Melgen was withholding the contribution other than the timing of the meeting. To resay, even a close temporal relationship is not enough to infer an explicit *quid pro quo*. In *Empress Casino*, the government introduced FBI recordings as evidence that the public official was withholding the official act until he received

**FOR PUBLICATION**

the political contribution. In the recordings, the Governor discussed the racetrack owners'

desperation that he sign the '08 Act, and instructed his subordinate to inform the racetrack

owners that he would not do so until they made a contribution. 763, F.3d at 731. There was also

evidence that the Governor's staff member in fact informed the racetrack owners of the

Governor's terms. *Id.* Conversely, the only evidence indicating that Melgen withheld the

contribution is the timing of the Brownfield meeting. When asked for the contribution, Melgen's

staff always responded that he would donate the $60,000, rebutting the allegations that the

contribution was contingent upon any act by Menendez.

The Government further argues that a jury can infer an explicit *quid pro quo* from

escalation. Specifically, the Government contends that a jury may find an explicit *quid pro quo*

because Menendez advocated more zealously to Brownfield in May 2012 than he had in his

earlier, September 2011 meeting. ECF No. 251, at 6. This is not evidence that either Defendant

was aware of the terms of the *quid pro quo*; other than that both events occurred in close

temporal proximity, the Government did not introduce any evidence that the advocacy was

related to the political contribution, rather than a continuation of Menendez's earlier failed

efforts to persuade Brownfield, part of his broader policy concerns relating to port security, or

simply advocating on behalf of a personal friend and political supporter unrelated to the specific

contribution.

While unusual official action may be evidence of an explicit *quid pro quo* in some

instances, more than strong advocacy is required. In *United States v. Terry*, 707 F.3d 607, 616

(6th Cir. 2013), the court stated that the jury could infer that the "unusual behavior [of the public

official], along with the other evidence, stemmed from an agreement to use his position as a

public official to do [the donor's] bidding." However, in that case there were tape-recorded

30

**FOR PUBLICATION**

phone calls in which the donor asked the defendant judge to deny summary judgment in two

cases, to which the judge replied "got it." *Id.* They discussed an upcoming fundraising event on

the same call. *Id.* at 610. The judge then denied both summary judgment motions "[w]ithout

reading the motions, without consulting the case files and without relying on the

recommendation of anyone—within the court system—who had read the files . . . ." *Id.* at 615.

There was also evidence that the donor stated that he believed that his donations would afford

him special privileges from the judge, "including 'granting a motion so it wouldn't tie a case

up.'" *Id.* (alterations omitted); *see id.* at 615 (noting that the donor expected special attention

"whether it would be a character reference or whether it would be a case").

Here, the official action consisted of Menendez advocating a policy position consistent

with a position he had taken years earlier. This is far less unusual than an on-demand denial of

summary judgment without any familiarity with the case or consultation of the motion papers.

Further, unlike in *Terry*, there is no evidence here that Defendants discussed the alleged official

acts during the relevant time, and no statement by Melgen that he expected to get special

privileges as a result of the political contributions. Even if Menendez's renewed interest in the

ICSSI contract did originate from a conversation with Melgen, and was intended to further his

interests, there is no evidence that it was in any way related to the contribution.

The Government also contends that there is evidence that Defendants concealed their

conduct. The Government contends that Menendez's intent to exchange his advocacy for

Melgen's political contribution is demonstrated by an email from Menendez staff member Jodi

Herman in which she stated that she had to "drag [information about the Brownfield meeting]

out of him." This failure to disclose further information to a staff member about the subject of

the meeting is not sufficient evidence for a rational juror to infer that Menendez was concealing

**FOR PUBLICATION**

the information. Further, even if Menendez was withholding the information from his staff, there is no evidence that the reason he was doing so was connected to the $60,000 contribution.

The Government also alleges that Melgen concealed his identity by providing $20,000 through his daughter Melissa. The Government references the circumstance that on the same day that Melgen's daughter donated $20,000 to the NJDSC, she also received a $20,000 check from Melgen's company, VRC. The Government alleges that Melgen made the contribution through an illegal conduit, demonstrating both the concealment of his identity, and also his "willingness to break the law." ECF No. 251, at 6. However, the Government has not introduced any evidence that the check from VRC was reimbursement for the contribution. Further, there is no evidence that such a reimbursement would violate campaign finance laws. And Melgen did nothing to "conceal" the remaining $40,000 in contributions. More importantly, none of this is evidence that would permit a rational juror to infer that the donation was connected with the specific official act—Menendez's meeting with Brownfield.

Finally, the Government argues that an explicit *quid pro quo* can be inferred from the "defendants' pattern of corrupt activity and concealment, established through a years-long stream of benefits in return for official acts." *Id.* at 11. However, a rational juror cannot infer that Defendants knew the terms of this alleged *quid pro quo* simply because they are alleged to have committed bribery in another context. In *Empress Casino*, the jury was not permitted to infer an explicit *quid pro quo* as to the '06 Act, despite significant evidence that the defendant had engaged in the exact same conduct two years later with the '08 Act. 763 F.3d 723. Similarly, in *United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011), the jury was not permitted to infer an explicit *quid pro quo* with regard to one public official, despite substantial evidence against another public official codefendant. Because an explicit *quid pro quo* requires that the charged

FOR PUBLICATION

defendant be aware of the terms of the precise exchange alleged, general allegations that the defendant was involved in corrupt activity is not sufficient to support such a finding without specific evidence. *See Empress Casino*, 763 F.3d 723.

In sum, the evidence introduced by the Government shows only a close temporal relationship between the Brownfield meeting and the contributions, communications between Melgen and Menendez's fundraisers about the contributions, that one member of Menendez's staff stated that she had to "drag [information] out of him," and a check from VRC to Melissa Melgen with the notation of "Salary." This evidence, viewed in the light most favorable to the Government, is insufficient to permit a rational juror to find an explicit *quid pro quo*.

The Court emphasizes that the agreement need not be express, *Siegelman*, 640 F.3d at 1171, and that a jury may infer a *quid pro quo* from circumstantial evidence, *Carpenter*, 961 F.2d at 827. However, no case furnished by the Government or found by this Court has permitted a jury to infer an explicit *quid pro quo* without factual evidence connecting the *quid* and the *quo*. *Cf. Empress Casino*, 763 F.3d 723 (message delivered to donor that governor would not sign legislation until he received donation); *Terry*, 707 F.3d 607 (testimony and recorded conversations that donor expected "special attention," and donee judge's denial of summary judgment at donor's request without reading any case files); *Siegelman*, 640 F.3d 1159 (statement by defendant that donor wanted appointment to executive position in exchange for donation); *Inzunza*, 638 F.3d 1006 (explicit promises to donor regarding the official acts); *United States v. Hill*, Nos. 94-10498, 94-10500, 1995 WL 699835, at *2 (9th Cir. Nov. 27, 1995) (testimony and recorded statements that state legislator knew he was "taking [campaign contributions in exchange] for the bill"); *United States v. Tomblin*, 46 F.3d 1369, 1381 (5th Cir. 1995) (testimony that public official agreed to accept campaign contributions as bribes); *United*

**FOR PUBLICATION**

*States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993) (testimony that defendants agreed to solicit campaign contributions in exchange for police commission); *Carpenter*, 961 F.2d 824 (legislator's refusal to meet with lobbyists without first receiving contribution).

Aside from a close proximity in time, the Government has not introduced any evidence connecting the Brownfield meeting to the political contributions, or any evidence that Defendants even discussed the ICSSI contract as part of this alleged explicit *quid pro quo*. A rational juror could not find that either defendant each knew the terms of the *quid pro quo* charged in Counts 9 and 10. Defendants' motion for acquittal on Counts 9 and 10 is granted.

ii. Counts 11, 12, and 17: $300,000 to Majority PAC

Counts 11 and 12 charge Defendants Menendez and Melgen, respectively, with agreeing to exchange a $300,000 donation to Majority PAC for advocacy at the highest levels of the Centers for Medicare and Medicaid Services ("CMS") and the Department of Health and Human Services ("HHS") regarding Melgen's $8.9 million billing dispute with CMS. This advocacy culminated in a meeting with then-Acting Administrator of CMS Marilyn Tavvenner in June 2012, and a meeting with then-Secretary of HHS Kathleen Sebelius in August 2012. Count 17 charges the contribution as a thing of value in an honest services fraud scheme.

The $300,000 check was written on June 1, 2012, drawn on the account of Melgen's company, VRC, and delivered to Majority PAC through Menendez fundraiser and friend, Donald Scarinci. GX 201. On June 1, Melgen, Menendez, and Scarinci were at a Menendez for Senate fundraising event (the "Pegasus fundraiser"). Oct. 4, 2017, Tr. at 14; GX 198; GX 200. The next day, Scarinci sent Melgen a flyer describing Majority PAC, which stated that "Majority PAC may directly advocate for candidates [it] support[s]." GX 199.

FOR PUBLICATION

Menendez had first raised the issue of multi-dosing[6] to CMS in 2009, and again in 2011. Oct. 2, 2017, Tr. at 82; Sept. 27, 2017, Tr. at 138–40, 162. CMS did not change its policy on multi-dosing in response to either of these efforts.

Menendez raised the multi-dosing issue again in 2012. Within a week of the Pegasus fundraiser and Melgen's $300,000 contribution to Majority PAC, Menendez scheduled a meeting with Marilyn Tavenner. Oct. 3, 2017, Tr. at 92, 184. That meeting occurred on June 7. *Id.* at 109. To prepare for the meeting, Menendez met with Melgen's lawyer and lobbyist, Alan Reider. GX 203.

At the meeting, Menendez asked Tavenner to reexamine CMS's policy regarding multi-dosing. Oct 3, 2017, Tr. at 97–99, 170–71. They discussed multi-dosing generally, and they did not mention Melgen or Lucentis, the medicine Melgen had been multi-dosing. *Id.* at 98, 167.

Tavenner followed up with Menendez in July and informed him that CMS believed its multi-dosing policy was clear, and that CMS was not going to make any changes. *Id.* at 99. Menendez replied that he did not agree with her conclusions, and that he would "take it to the next steps." *Id.* at 100. Tavenner believed this to mean that Menendez would bring the issue to Sebelius. *Id.* Tavenner testified that this was the only time anyone from Congress brought her an issue and then elevated it to Sebelius. *Id.* at 101.

Menendez did elevate the issue to Sebelius. Menendez first attempted to directly schedule the meeting with her, but she refused at the advice of her staff. *Id.* at 179. Menendez then enlisted the help of then-Senate Majority Leader Harry Reid. Oct. 4, 2017, Tr. at 51, 58. At Menendez's request, Reid contacted Sebelius to set up a meeting. *Id.* at 56–59. After consulting

---

[6] "Multi-dosing" is a medicine-delivery practice utilized by Melgen. Melgen's Medicare billing dispute, and Menendez's alleged advocacy on Melgen's behalf, involved the method by which Melgen sought reimbursement from Medicare for this practice.

**FOR PUBLICATION**

with legal counsel about whether it would be appropriate, Sebelius agreed to meet with Menendez. Oct. 3, 2017, Tr. at 180–81.

The meeting took place in Senator Reid's office, and lasted approximately thirty minutes. Oct. 3, 2017, Tr. at 179, 187. Reid opened the meeting and made some introductory comments, and there was testimony at trial that Melgen's name was mentioned by way of introduction. Oct. 2, 2017, Tr. at 98. Menendez led the substantive discussion, and stated that CMS's multi-dosing policy was unclear and unfair to providers. Oct. 3, 2017, Tr. at 183. Menendez discussed wastage of medicine, a change in multi-dosing rules between 2007 and 2010, and the need for policy clarification. *Id.* at 199–201. Tavenner and Sebelius did not recall anyone mentioning Melgen's name, and Sebelius testified that they "did not discuss specifically the [Medicare Advisory Committee ("MAC")]." *Id.* at 98, 200–01. HHS Employee Jonathan Blum testified that Sebelius explained that "the case was in the administrative process," and that "she had no authority to intervene or change course." Oct. 2, 2017, Tr. at 99. Blum then discussed multi-dosing and billing, and explained that it was CMS policy not to pay twice for a drug purchased only once by a physician. Oct 3, 2017, Tr. at 49, 201.

There was no mutual resolution at the end of the meeting, and Sebelius testified that the meeting was not satisfactory for anyone. *Id.* at 187.

Sebelius also testified that it was unusual for her to be involved in a billing dispute, and also unusual for Reid to ask her to meet with another member of Congress. *Id.* at 188. Blum testified that the meeting stuck out to him because of how angry Menendez became, and because meetings with members of Congress usually concern national policies or something within their own state. Oct. 2, 2017, Tr. at 104. After some brief follow-up, Menendez abandoned his efforts with HHS.

FOR PUBLICATION

From the evidence introduced at trial, no rational juror could find an explicit *quid pro quo*. The evidence consists of Defendants' presence at the Pegasus fundraiser, Melgen's June 1 contribution, and Menendez's later advocacy. This, without more, does not meet the heightened nexus requirement that applies to political contributions. *See Empress Casino*, 763 F.3d 723 ("To hold illegal an [official action] furthering the interests of some constituents shortly before or after campaign contributions are solicited and received 'would open up to prosecution not only conduct that has long been thought to be well within the law, but also conduct that is in a very real sense unavoidable . . . .'" (quoting *McCormick*, 500 U.S. at 272)).

Importantly, there is no evidence that Defendants actually met at the fundraiser, or, if they did, what if anything they talked about. As in *Empress Casino*, a single meeting before the official act and political contribution, without more, is not sufficient evidence from which a jury may infer an explicit *quid pro quo*. *See* 763 F.3d at 731; *see also Inzunza*, 638 F.3d at 1025 ("[W]e know nothing of what transpired at [Defendant's] half-hour meeting . . . at the 2001 fundraiser . . . .").

The Government again argues that an explicit *quid pro quo* can be inferred from Melgen's "concealment" of the $300,000 contribution. ECF No. 251, at 8. Here, the Government points to the circumstance that Melgen made the contribution through VRC rather than his personal account. The Government claims that the jury may infer that this is evidence of concealment because "most campaign contributions are made by individuals." *Id.* However, the Government did not present evidence to show that use of a company's funds to make political contributions is unusual. To the contrary, there is evidence that other companies contributed to Majority PAC that were not associated with Melgen. GX 240.[7]

_____

[7] There is evidence that Melgen also provided a $100,000 contribution to Majority PAC through VRC that was not earmarked for New Jersey. Oct. 11, 2017 Tr. at 15; DX 546. However, the fact that the donation was made through

FOR PUBLICATION

The Government also argues that a rational juror could infer that Melgen concealed his identity because he earmarked the contribution for the New Jersey Senate race, but "[t]hat earmark . . . is absent from Majority PAC's FEC reports." ECF No. 251, at 8. However, the Government did not introduce evidence that Melgen's earmark was designed to evade reporting requirements, or that the FEC would have otherwise included the earmark in its report. Further, to use Melgen's choice of contribution method itself as evidence of concealment raises significant First Amendment concerns. *See Citizens United*, 588 U.S. at 360 ("By definition, an independent expenditure is political speech . . . .").

Finally, the Government argues that a jury can infer an explicit *quid pro quo* from escalation. Similar to its argument with regard to the Brownfield meeting, the Government contends that a jury can infer an explicit *quid pro quo* because Menendez advocated against CMS's multi-dosing policy more zealously in 2012 than he had in 2009. ECF No. 251, at 9. The Government specifically refers to Menendez's insistence on speaking with Secretary Sebelius in 2012, while he settled for a phone call with a lower-level CMS employee in 2009. The Government claims that the escalation is also demonstrated because Menendez "did not conduct any official action on [Melgen's] CMS dispute for years" before scheduling the meeting with Tavenner in 2012. ECF No. 251, at 9.

As with the Brownfield meeting, increased advocacy in 2012 is not sufficient evidence from which a rational jury could infer an explicit *quid pro quo*. The Government's "escalation" argument is essentially a recapitulation of its argument that the advocacy and the political contribution occurred close in time. There is no evidence that the advocacy was the result of a

---

VRC was not introduced until Defendants' case, and will not be considered for purposes of the reserved Rule 29 motion. Considered as part of the record for Defendants' renewed Rule 29 motion, Melgen's non-earmarked $100,000 Majority PAC contribution further weakens the Government's allegations that his earmarked contributions were bribes.

FOR PUBLICATION

bribe, rather than Menendez's frustration that CMS had not been receptive to the concerns he had voiced in 2009. There is evidence that Menendez wanted to speak with Sebelius in 2012 specifically because he "didn't feel like [he] was getting adequate responses from [CMS]." Oct. 4, 2017, Tr., at 57. That Senator Reid expressed similar criticism of CMS's multi-dosing policy and agreed to help Menendez further rebuts the Government's contention that Menendez's enthusiasm is evidence of an explicit *quid pro quo*. The Government's contention that Menendez did not conduct "any official action" on the CMS dispute for years ignores that Menendez scheduled a meeting between Melgen and Senator Harkin in 2011 about this issue. Sept. 27, 2017, Tr. at 138–40, 162.

Again, the nature of the official action is less "unusual" than in *Terry*. A senator advocating for a policy position he had taken years earlier with the support of the Senate Majority Leader is far less unusual than the official acts taken by the judge in that case. *See Terry*, 707 F.3d 607. Further, there is no evidence that Defendants here ever discussed the political contributions in connection with the Sebelius meeting, and no statement that Melgen expected to get anything in return for the political contributions.

The Government did not introduce evidence from which a rational juror could find an explicit *quid pro quo*. The only connection between Menendez's increased advocacy and the political contribution is that they occurred in a close temporal proximity. Defendants' presence at the Pegasus fundraiser, that Melgen provided the donation through VRC, and the zealous nature of Menendez's advocacy are not enough to meet the heightened requirement of an explicit *quid pro quo*.

The failure of the Government to produce evidence of facts either direct or circumstantial as predicates for proffered inferences evokes Gertrude Stein's celebrated critique of her

**FOR PUBLICATION**

hometown, Oakland. "There is no there there." Gertrude Stein, *Everybody's Autobiography*

(1937). The Government asks the Court and a jury to fashion speculative inferences under the

conclusory generalizations of context, chronology, escalation, concealment, and a pattern of

corrupt activity—each of which is empty of relevant evidential fact.

      In this opinion, "no there there" means the absence—the lack of presence—of a fact or

facts which demonstrate, or reasonably tend to demonstrate, a relevant subject or issue of

inquiry. These facts may be direct proof. Or they may be circumstantial proof from which the

presence of other facts or reasonable inferences may be determined. But they must be present to

demonstrate the subject or issue. The facts are not here as base for the Government's advanced

inferences. Defendants' motion is granted.

iii.  <u>Counts 13 and 14: $300,000 to Majority PAC</u>

      Counts 13 and 14 charge Defendants with agreeing to exchange a second $300,000

donation to Majority PAC for advocacy to the highest levels of HHS. This advocacy did not

ultimately occur. The Government suggests that any potential advocacy was stymied by press

inquiries into Defendants' relationship. *See* ECF No. 251, at 11 (noting that the "press was

making explosive inquiries into defendant Menendez's flights on defendant Melgen's plane,

making it difficult for defendant Menendez to continue his advocacy on behalf of defendant

Melgen").[8]

      Melgen issued the second $300,000 check to Majority PAC on October 12, 2012. GX

232; Oct. 4, 2017, Tr. at 98. Like the June 1 check, it was earmarked for the New Jersey Senate

---

[8] The Superseding Indictment further alleges that the agreement included an additional donation of $103,500 to "various New Jersey county Democratic Party entities." ECF No. 149, at ¶¶ 249, 251. At oral argument and in their reply brief, Defendants argue that the Court should grant a "limited acquittal" on the $103,500. ECF No. 255, at 13. Because the Defendant's motion for acquittal on these counts is granted, the additional argument for a limited acquittal is now moot.

FOR PUBLICATION

race. GX 240; Oct. 4, 2017, Tr. at 103. Also like the June 1 check, Melgen sent it to Menendez

through Scarinci. GX 232. Majority PAC fundraiser Jake Perry emailed Melgen to thank him for

the contribution five days later. GX 233; Oct 4, 2017, Tr. at 104.

On October 19, two days after Perry's "thank you" email, Melgen sent separate emails to

Perry, O'Brien, and Menendez. These emails contained an update about his ongoing MAC

appeal, and attached a memo entitled "Status of Medicare Audit and Appeal," which outlined a

legal argument defending the validity of Melgen's billing practices. GX 234; GX 236; GX; 237;

Oct. 4, 2017, Tr. at 106. The final section of the memo, entitled "The Secretary's Authority,"

advised that "[i]t would be appropriate for the Secretary of the Department of Health and Human

Services [Sebelius] to intervene during the pendency of [Melgen's] appeal before the MAC to

clarify that, as to the period to January 1, 2011, CMS policy permitted physicians and providers

to bill for overfill." GX 236. That section went on to say that "there is nothing to preclude the

Secretary from clarifying agency policy on drug overfill prior to the period January 1, 2011

regardless of whether that pronouncement would affect the Practice's pending MAC appeal." *Id.*

Perry responded the next day and said: "I'm going to see him on Tuesday. I will give this

to him directly. . . . I am sure he will forward this to Kate Leone in his office." DX 540.

On October 22, Melgen contacted Menendez and O'Brien with another update on the

MAC appeal. GX 238, 239. The email indicated that Melgen's attorney believed that the MAC

was preparing to come to a decision, and that "any other effort will have to be done relatively

quickly[.]" GX 239. O'Brien responded, "[t]hanks, will call you." GX 239. The Government

introduced no further evidence of Menendez's involvement with multi-dosing policy or the MAC

appeal.

FOR PUBLICATION

On November 1, the Washington Post began inquiring about the flights Menendez took on Melgen's jet, and asking whether they were approved by the ethics committee. GX 103.

From this evidence, a rational juror could not find an explicit *quid pro quo*. The evidence shows only that Melgen provided another $300,000 political contribution, and that he also sent Menendez information about his ongoing MAC appeal. There is nothing that connects the donation to any specific official act.

Menendez's advocacy had ended after the August meeting with Sebelius. While "fulfillment of the *quid pro quo* is not an element of the offense," *Evans*, 504 U.S. at 268, the absence of any post-contribution official action rebuts the Government's allegation of a *quid pro quo*. The Government's contention that future official action was thwarted by press inquiries is belied by Menendez's continuing to advocate for Melgen with regard to the ICSSI contract in January 2013, two months after the press inquiries. GX 158; Sept. 28, 2017, Tr. at 121.

For Counts 13 and 14, there is no coincidental timing, no communication between Defendants about the political contribution, and no official action. While it is possible that Melgen sent the memo to Menendez fundraiser Jake Perry because he associated his CMS dispute with the Majority PAC contributions, Perry testified that Melgen had sent him the memo to give to his former boss Senator Reid. Oct. 4, 2017, Tr. at 129. This is corroborated by Perry's email to Melgen saying that he would "give it to him on Tuesday" and referencing Reid's staff person Kate Leone. *Id.* at 147; DX 540. The evidence shows that Melgen had told Perry about his billing dispute multiple times before the $300,000 donation and Sebelius meeting, including in early 2012 when they first met, and again in March 2012 when Perry stayed with him in the Dominican Republic. Oct. 4, 2017, Tr. at 88.

FOR PUBLICATION

Even if Melgen hoped that Menendez would advocate to Secretary Sebelius on his behalf, any efforts to enlist Menendez's help would not violate section 201 absent an explicit *quid pro quo*. *See McCormick*, 500 U.S. at 273.

Because there is no evidence in support of Counts 13 and 14 other than Melgen's contribution and his later distribution of the memo regarding the "Secretary's Authority," no rational juror could infer an explicit *quid pro quo*. Defendants' motion for acquittal on Counts 13 and 14 is granted. "There is no there there." Gertrude Stein, *Everybody's Autobiography* (1937).

iv.   <u>Count 1: Conspiracy</u>

Defendants also argue that Count 1, charging them with conspiracy to commit bribery and honest services fraud, must be dismissed because it charges political contributions as things of value exchanged in the alleged conspiracy. Because the conspiracy charged in Count 1 does not rely exclusively on Defendants' alleged conduct involving the political contributions, the Court denies the motion as to Count 1.

**II.    Count 2, Travel Act, 18 U.S.C. § 1952.**

Defendants move for acquittal on Count 2, which charges a violation of the Travel Act, 18 U.S.C. § 1952. The Government must prove three elements for a Travel Act conviction: "(1) interstate travel or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of the unlawful activity." *United States v. Wander*, 601 F.2d 1251, 1258 (3d Cir. 1979). Regarding the third element, while the Government need not "prove that the defendant committed an illegal act after the travel," it must "prove some conduct after the travel in furtherance of the unlawful activity." *United States v. Zolicoffer*, 869 F.2d 771, 775 (3d Cir. 1989).

43

FOR PUBLICATION

### a. A Rational Juror Could Find That Menendez's Acceptance and Use of the Paris Hotel Room Was a "Subsequent Overt Act in Furtherance of Unlawful Activity" on the Travel Act Count.

Defendants first argue that the alleged crime of bribery, on which Count 2 is based, was complete when the alleged corrupt agreement was reached in the United States, and thus no "subsequent overt act in furtherance of the unlawful activity" could have occurred. ECF No. 241, at 53–54. The Court has already considered and rejected this argument, advanced in a motion to dismiss the indictment, and no different conclusion is required here. *See* ECF No. 129, at 17–20. Viewing the evidence in the light most favorable to the Government, a rational juror could conclude that Menendez's acceptance and use of the hotel room in Paris—facts which Defendants did not challenge—constituted "some conduct after the travel in furtherance of the unlawful activity." *Zolicoffer*, 869 F.2d at 775.

Second, Defendants contend that, to the extent Menendez's conduct in Paris can be considered an acceptance of a bribe "in furtherance" of the alleged unlawful activity, that activity cannot be punishable under 18 U.S.C. § 201 because it occurred outside the United States. *Id.* at 54–56. This is so, according to Defendants, because section 201 makes no mention of extraterritorial application, and when "a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013) (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 255 (2010)). Defendants argue that the Supreme Court's recent decision in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), "confirms that the canon of statutory construction known as the 'presumption against extraterritoriality' generally applies to all statutes, whether civil or criminal," and requires acquittal on Count 2. ECF No. 241, at 54–56.

44

**FOR PUBLICATION**

Whether under *Kiobel* and *RJR Nabisco* section 201 could be violated by overseas conduct is of no moment. At issue here is whether Menendez's alleged actions in Paris could constitute "*some* conduct after the travel in furtherance of [a section 201 violation]." *Zolicoffer*, 869 F.2d at 775 (emphasis added). Again, those actions need not be illegal, and thus do not implicate extraterritoriality concerns because the Travel Act does not require proof that Menendez completed the underlying offense after traveling abroad. *Id.*

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### III.    Count 18, False Statements, 18 U.S.C. § 1001.

Defendant Menendez argues that the Court should dismiss the charge of making false statements under 18 U.S.C. § 1001. Section 1001(a)(1) provides that a person may not "knowingly and willfully . . . falsif[y], conceal[], or cover[] up . . . a material fact."

#### a.    A Rational Juror Could Conclude that Menendez's Financial Disclosure Omissions Were Material and Made Knowingly and Willfully.

Defendant first argues that the Government did not introduce any evidence to prove that the statement was "material." "To be 'material,' 'the statement must have a natural tendency to influence, or [be] capable of influencing, the decisionmaking body to which it was addressed.'" *United States v. McBane*, 433 F.3d. 344, 350 (3d Cir. 2005) (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (alterations omitted).

Materiality is an objective inquiry; the false statements must be "of a type capable of influencing a reasonable decisionmaker." *Id.* at 351. The Government need not prove that the false statement actually had such influence on any particular decisionmaker. *Id.* A statement is

FOR PUBLICATION

material if it has a "natural tendency to influence." *Id.* (quoting *Gaudin*, 515 U.S. at 512). This quality is one that "inheres in the statement itself." *Id.*

Viewing the evidence in the light most favorable to the Government, a rational juror could find that a reasonable decisionmaker would be influenced by the omission of reportable gifts form the Senate disclosure forms. The disclosure form is mandatory, and Senate rules require accurate reporting. *E.g.*, GX 94. This is clear from the face of the form itself. A rational juror could find that the content of such a disclosure form has a "natural tendency to influence." *McBane*, 433 F.3d at 344.

The Government was not required, as Menendez contends, to introduce testimony of the Secretary of the Senate that such forms are or were relied upon. The document itself is evidence from which a reasonable jury could conclude that the statement is "of a type capable of influencing a reasonable decisionmaker." *Id.* at 351; *see United States v. Moyer*, 674 F.3d 192, 214 (3d Cir. 2012) (finding a statement material based on the content of the statement alone); *United States v. Silman*, 287 Fed. Appx. 224, 226 (3d Cir. 2008) (same); *see also United States v. Service Deli, Inc.*, 151 F.3d 938, 941 (9th Cir. 1998) ("[The] test for materiality is the intrinsic capabilities of the statement itself . . . .").

Second, Menendez also contends that the Government has not presented evidence that he made the concealment "knowingly and willfully."

The Government must establish that the Defendant Menendez "acted deliberately and with knowledge that the representation was false." *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994). Because the statute requires that the concealment be "knowing and willful," the Government is "required to show that the misrepresentation was not made innocently or

46

inadvertently." *United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009) (quoting *Curran*, 20

F.3d at 567) (quotation marks omitted).

Here, viewing the evidence in the light most favorable to the Government, a rational juror

could find that Menendez had knowledge that the statements were false. The evidence shows that

Menendez is a seasoned politician, meaning he has been required to fill out such disclosures

many times in his career. The evidence shows that Menendez personally received and consumed

the unreported gifts of travel accommodations and lodging. *E.g.*, GX 55; GX 58; GX 87. The

evidence also shows that, on the face of the disclosure form itself, disclosure of these gifts was

required. *E.g.*, GX 94.

From these facts, a rational juror could infer that Menendez knew that he had received the

gifts, and knew that he was required to report them. Menendez was free to argue to the jury that

he made the misrepresentations "innocently or inadvertently," *Starnes*, F.3d at 211, but the

Government has presented evidence from which a rational juror could conclude that they were

not. *See id.* at 212 (considering notice to the defendant of disclosure requirements and

defendant's extensive professional experience when finding defendant's false statement

"knowing and deliberate").

Defendants' motion for acquittal on this basis is denied. Regarding Defendants' renewed

Rule 29 motion, none of the evidence presented by Defendants requires a different conclusion.

### b.  A Rational Juror Could Find Venue is Proper in the District of New Jersey on Count 18.

Following the Defendants' presentation of evidence, Menendez moved to renew his

motion for a judgment of acquittal on Count 18, which charges him with violating 18 U.S.C.

§ 1001, making the additional argument that the Government failed to prove venue. ECF No.

262, at 1.

FOR PUBLICATION

Menendez contends that "[t]he only evidence concerning venue presented during the [G]overnment's case was a calendar entry reflecting that Senator Menendez was in New Jersey on May 16, 2011, the same day [] one of the disclosure forms charged in Count 18 is dated." ECF No. 262, at 1. According to Menendez, his administrative director's testimony that Menendez signed and pre-dated that particular form in Washington, D.C. days before it was submitted is dispositive on this issue because "there is no way that particular disclosure statement could have been signed in New Jersey on the same day it was filed by hand in Washington, D.C." *Id.* Menendez further argues that venue is not supported by any of the other disclosure forms because all the jury heard about their filing was that it was Menendez's practice to sign the forms in Washington, D.C. before the date they were due. *Id.* In addition, during Menendez's oral Rule 29 motion, he reiterated an argument that the Court rejected in denying his earlier motion to dismiss for lack of venue—that venue can only be appropriate in Washington, D.C., because that is the place the Ethics in Government Act requires that the relevant financial disclosure forms be filed. *See* Oct. 11, 2017, Tr. at 157–58.

The Government responds by offering three bases for venue. First, the available evidence indicates that Menendez was in New Jersey on May 16, 2011, when he signed the 2010 financial disclosure form. Second, the evidence shows that Menendez accepted things of value in New Jersey that he improperly omitted from his financial disclosure forms. Third, even if the jury credits the administrative director's testimony that Menendez signed the form in Washington, D.C. before departing for New Jersey, they can find that Menendez caused the form to be filed while in New Jersey.[9] ECF No. 264, at 2–3.

---

[9] Because this third basis for venue finds no support in the trial record, the Court will not consider it.

**FOR PUBLICATION**

Article III of the Constitution requires that crimes be tried "in the State where the said Crimes have been committed." Art. III, § 2, cl. 3. "Its command is reinforced by the Sixth Amendment's requirement that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed,' and is echoed by Rule 18 of the Federal Rules of Criminal Procedure ('prosecution shall be had in a district in which the offense was committed')." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999).

18 U.S.C. § 1001 does not contain an express venue provision. Where Congress has not prescribed a specific venue requirement for a particular crime, courts must determine the crime's *locus dilecti. United States v. Auernheimer*, 748 F.3d 525, 532 (3d Cir. 2014). "[T]he *locus dilecti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Anderson*, 328 U.S. 699, 703 (1946); *accord United States v. Calabres*, 524 U.S. 1, 6–7 (1998). In making that determination, courts "must be careful to separate 'essential conduct elements' from 'circumstance element[s],'" because the latter cannot support venue. *Auernheimer*, 748 F.3d at 533 (quoting *Rodriguez-Moreno*, 526 U.S. at 280 & n.4).

Offenses that are "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). This continuing-offense venue provision applies to section 1001. *See United States v. Ringer*, 300 F.3d 788, 791 (7th Cir. 2002); *United States v. Simon*, 510 F. Supp. 232, 238 (E.D. Pa. 1981). The Government must prove venue by a preponderance of the evidence. *United States v. Perez*, 280 F.3d 318, 330 (3d Cir. 2002).

FOR PUBLICATION

Where a defendant falsifies a mandatory federal filing, venue is appropriate in the district where the form was falsified or signed. *See, e.g.*, *United States v. Clark*, 728 F.3d 622, 625 (7th Cir. 2013) (holding that venue in section 1001(a)(3) prosecution for making and using false statements is not limited to place of filing, in part because "'making' is an essential element" of the crime); *United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir. 1991) (finding venue proper where forms were prepared and signed, rather than district where they were filed, in section 1001 prosecution for making false statements by filing false forms with SEC); *Simon*, 510 F. Supp. at 238 (finding venue proper where statements were made and mailed in section 1001 prosecution for making false statements to federal agency).

Additionally, where the Government alleges a scheme to conceal material facts, *Calabres*, 524 U.S. at 6–7, underlying acts taken in furtherance of the scheme may establish venue, even if the concealment is completed in another district. *See United States v. Hernando Ospina*, 798 F.2d 1570, 1577 (11th Cir. 1986) (finding venue proper in section 1001 prosecution for concealment of material facts from IRS in money laundering scheme because defendant engaged in a "scheme" to conceal in that district, including collecting and exchanging cash for structured checks to avoid CTR filing requirement, even though CTRs were required to be filed in Washington, D.C.); *United States v. Curran*, No. 92–558, 1993 WL 137459, at *22 (E.D. Pa. Apr. 28, 1993) *vacated on other grounds*, 20 F.3d 560 (3d Cir. 1994) (finding venue proper in 18 U.S.C. §§ 1001 and 2(b) prosecution for conspiracy to conceal material facts from the FEC in district where defendant engaged in scheme to cause the FEC to make false filings by directing employees to make campaign donations under their own names and then reimbursing them, even though actual FEC filings occurred in Washington, D.C.).

FOR PUBLICATION

Count 18 alleges a scheme to conceal. The Superseding Indictment charges Menendez

with violating 18 U.S.C. § 1001(a)(1), which criminalizes "knowingly and willfully . . .

falsif[ying], conceal[ing], and cover[ing] up by a trick, scheme, or device a material fact," ECF

No. 149, at ¶ 261; 18 U.S.C. §1001(a)(1), and the jury charge explains that Count 18 charges

Menendez "with knowingly and willfully engaging in a scheme to conceal a material fact," Jury

Charge at 60. Logically, the alleged scheme includes the acceptance of gifts, the omissions of

those gifts from financial disclosure forms, the signing of forms falsely certifying the truth and

accuracy of those forms, and the filing of those forms. Those acts are more than "anterior

criminal conduct" that the Supreme Court has held to be "circumstance element[s]" insufficient

to support venue; they are part and parcel of the charged scheme. *Rodriguez-Moreno*, 526 U.S. at

280 n.4.

It is this "nature of the crime alleged" that distinguishes this case from *Cabrales*. There,

the Supreme Court held that venue for a money laundering prosecution was proper only in

Florida, where the transactions occurred, and not in Missouri, where the laundered funds were

unlawfully generated. *Cabrales*, 524 U.S. at 7. The money laundering statutes at issue in

*Cabrales* "interdict only the financial transactions (acts located entirely in Florida), not the

anterior criminal conduct that yielded the funds allegedly laundered." *Id.* Here, by contrast,

section 1001(a)(1) expressly interdicts the scheme itself, not merely the filing that is the

culmination of the scheme.

Given the above legal bases for venue, and assessing the evidence presented at trial in the

light most favorable to the Government, a rational juror could find by a preponderance of the

evidence that venue is proper in this district in at least two different ways. First, a rational juror

could conclude that Menendez, while in New Jersey on May 16, 2011, signed one of the

financial disclosure forms alleged to be part of the scheme to conceal material facts in Count 18.

Menendez signed his financial disclosure report for calendar year 2010 and dated it May 16,

2011, the same date reflected in a "RECEIVED, SECRETARY OF THE SENATE" stamp on the

report. GX 101. An itinerary covering May 15–17, 2011 reflects that Menendez was in New

Jersey all day on May 16, except for a few hours he spent in New York City. GX 102. It is true

that Menendez's administrative director testified that Menendez signed and dated the form not

on May 16, but rather "[t]he previous week and before he left Washington, D.C." for New

Jersey. Oct. 25, 2017, Tr. at 134:10–11. On balance, however, a rational juror could discount that

testimony and conclude that Menendez signed the form while in New Jersey on May 16, and

transmitted it (by fax or email, for example) to Washington, D.C. for filing. The administrative

director's recollection proved faulty on this topic, for example, when he testified that it was

Menendez's practice to "just sign it for the due date and date it for the due date, not the date that

it was signed." *Id.* at 130–33. Menendez's financial disclosure report for calendar year 2009,

which the administrative director testified he helped prepare, reflects that Menendez signed and

dated it on May 13, 2010; the form was not filed with the Senate, however, until May 17. GX 99;

Oct. 25, 2017, Tr. at 190–91 (referring incorrectly to exhibit 95).

Second, a rational juror could find that Menendez took an underlying act or acts in

furtherance of his scheme to conceal while in the District of New Jersey; that is, a rational juror

could find that Menendez received, used, or possessed in this District one or more gifts that

should have been reported in his annual Senate financial disclosure forms. *See, e.g.*, Sept. 13,

2017, Tr. at 141–45 (testimony of pilot Robert Nylund regarding undisclosed Summer 2008

flight from Teterboro, New Jersey to Dominican Republic with Menendez as passenger); GX 87

(listing seven undisclosed flights arriving in or departing from New Jersey on which Menendez

FOR PUBLICATION

was a passenger); *see also Hernando Ospina*, 798 F.2d at 1577 (finding venue proper in section 1001 prosecution where "virtually all the acts comprising that scheme to conceal were carried out" in venue district, including accumulation and transfer of laundered funds).

    Defendants' motion for acquittal on this basis is denied.

## CONCLUSION

    For these reasons, Defendants' Rule 29 motion is granted in part, and denied in part.  An appropriate order follows.

DATE: 24 Jan 2018

William H. Walls
Senior United States District Court Judge